**Olga Maricela TORRES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 13–96–613–CR, 13–96–615–CR.**

Court of Appeals of Texas,
Corpus Christi.

Aug. 27, 1998.

Ernesto Gamez, Jr., Law Offices of Ernesto Gamez, Jr., Brownsville, for Appellant.

Yolanda De Leon, District Attorney, John A. Olson, Asst. County & District Attorney, Brownsville, for State.

## OPINION

RODRIGUEZ, Justice.

Appellant, Olga Maricela Torres, was charged, by two separate indictments, with the murder of one of her sons and the attempted murder of another. A jury found her guilty and assessed punishment at forty-five and fifteen years in prison, respectively. The sentences are to be served concurrently. By two points of error, Torres challenges her convictions, alleging she conclusively established the affirmative defense of insanity. We affirm.

In the early morning hours of August 7, 1995, Torres entered the bedroom of her nine-year-old son, Steven Ray Torres, and shot and killed him. She next entered the bedroom of her twelve-year-old son, Willie Joe Torres, and shot him. The gunshot to Willie Joe was not fatal. After discovering what she had done, Torres's parents, with whom she lived, called 911. A police officer arrived, wrested the gun from Torres, and arrested her. Torres was charged with murder and attempted murder.

Concerned with Torres's mental state, the trial court appointed Dr. David Moron to ascertain Torres's competence to stand trial. He and another psychiatrist examined her and opined that she was incompetent. Thereafter, a hearing was held, where a jury determined she was incompetent to stand trial. After spending approximately two months in a state hospital, Torres was re-examined and deemed competent to stand trial.

At trial, the only contested issue was whether Torres was legally insane when she committed the offenses. By its guilty verdict, the jury implicitly found Torres was sane at the time of the shootings.

By two points of error, Torres challenges the legal and factual sufficiency of the evidence supporting the jury's implicit rejection of her insanity defense.

In examining the legal sufficiency of the evidence supporting an affirmative defense, we review all the evidence in the light most favorable to the verdict and sustain the challenge only if there is no rational basis upon which the jury could have rejected the defense's contention. *Cooney v. State*, 803 S.W.2d 422, 425 (Tex.App.—El Paso 1991, pet. ref'd); *Moranza v. State*, 913 S.W.2d 718, 723 (Tex.App.—Waco 1995, pet. ref'd); *Cover v. State*, 913 S.W.2d 611, 619(Tex.App.—Tyler 1995, pet. ref'd). The fact finder is the sole judge of the credibility of witnesses and the weight accorded their testimony. *Cooney*, 803 S.W.2d at 425. Any inconsistencies in the evidence are resolved in favor of the verdict. *Id.*

When we examine the factual sufficiency of the evidence on an affirmative defense, we consider all the evidence relevant to the issue at hand to determine whether the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex.Crim.App.1990). In reviewing a factual sufficiency point of error, we must remain appropriately deferential to the trial court so as to avoid this Court substituting its judgment for that of the factfinder. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex.Crim. App.1996). It is the trier of fact who judges the credibility of the witnesses and the weight to be given their testimony, and it may resolve or reconcile conflicts in the testimony as it sees fit. TEX.CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1994); *Clewis*, 922 S.W.2d at 133. This Court may only reverse a jury's findings if the verdict is so against the great weight and preponderance of the evidence that it is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." *Meraz*, 785 S.W.2d at 154 n. 2; *see also Clewis* 922 S.W.2d at 135.

"To establish an insanity defense, the defendant must prove by a preponderance of the evidence that, at the time of the offense, the defendant, as a result of severe mental disease or defect, did not know that his con-

duct was wrong." *Ward v. State*, 787 S.W.2d 116, 117 (Tex.App.—Corpus Christi 1990, pet. ref'd). The record reveals two psychiatrists testified that, in their respective opinions, appellant did not know right from wrong at the time of the offense. However, both psychiatrists also admitted a person affected by depression similar to the way in which appellant was affected could still know right from wrong. Dr. Moron testified appellant denied having any delusions, hallucinations, or other symptoms of losing touch with reality. He further testified appellant exhibited signs of organizational skills at the time of the offense. There was evidence appellant was worried that because of her father's failing health, she would be unable to provide for her sons and her ex-husband might obtain custody of them. In fact, Dr. Moron testified that appellant's conduct could be a result of her wanting to prevent such an occurrence. There was evidence appellant's friend, Aida Cano, believed her to be "doing fairly well" the day before the offense. There was evidence appellant believed her sons "got what they deserved." Additionally, evidence suggests appellant may have attempted to muffle the sound of the firearm with a pillow. Finally, when appellant's father went to call for help, appellant pleaded with him: "don't call the police, Dad."

Expert testimony on the issue of appellant's ability to determine right from wrong does not establish insanity as a matter of law. *Graham v. State*, 566 S.W.2d 941, 943 (Tex.Crim.App.1978). In fact, while expert testimony may be helpful to a jury, the issue of insanity is outside the purview of medical experts and should be left the discretion of the trier of fact. *Id.* at 952–53. The trier of fact may consider such evidence as the appellant's demeanor before and after the offense, *Schuessler v. State* 719 S.W.2d 320, 329 (Tex.Crim.App.1986, en banc), *overruled on other grounds, Meraz*, 785 S.W.2d at 155, appellant's attempts to evade police,*Murray v. State*, 147 Tex.Crim. 474, 182 S.W.2d 475, 477 (1945), attempts to conceal incriminating evidence, *Schuessler*, 719 S.W.2d at 330, appellant's expressions of regret or fear of the consequences of her ac-

tions, *Graham*, 566 S.W.2d at 952, other possible motives for the offense, *Schuessler*, 719 S.W.2d at 330, and other explanations for appellant's behavior. *Id.* While no one piece of evidence is dispositive, the record clearly shows controverting evidence as to whether appellant knew the difference between right and wrong. We find that a rational trier of fact could have resolved the conflicting testimony regarding legal insanity against appellant. Furthermore, the jury's decision to disbelieve the insanity testimony was not so against the great weight and preponderance of the evidence that it was "manifestly unjust," "shocked the conscience," or "clearly demonstrated bias." Both of appellant's points of error are overruled.

The judgments of the trial court are AFFIRMED.

YANEZ, J., dissents joined by DORSEY, J.

YANEZ, Justice, dissenting.

Although I concur with the majority with respect to legal sufficiency of the evidence, I respectfully dissent from the majority's conclusion as to the factual sufficiency of the evidence supporting the verdict. In my view, the great weight and preponderance of the evidence demonstrated that appellant was legally insane at the time of the shootings, and that the verdict is manifestly unjust.

To establish the defense of insanity, appellant needed to establish by a preponderance of the evidence that, at the time of the offense charged, she was suffering from a severe mental disease or defect and, as a result of that disease or defect, did not know that her conduct was wrong. TEX. PENAL CODE ANN. §§ 2.04 and 8.01(a) (Vernon 1994). This Court has authority to review fact questions in criminal cases. *See Clewis v. State*, 922 S.W.2d 126, 129–30 (Tex.Crim.App.1996). When assessing whether appellant proved her affirmative defense of insanity by a preponderance of the evidence, we consider all the relevant evidence and determine whether "the judgment is so against the great weight

and preponderance of the evidence so as to be manifestly unjust." *Id.* at 132 (citing *Meraz v. State*, 785 S.W.2d 146, 155 (Tex.Crim.App.1990)); *Patel v. State*, 787 S.W.2d 410, 411 (Tex.Crim.App.1990); *Jackson v. State*, 941 S.W.2d 351, 352–54 (Tex.App.—Corpus Christi 1997, no pet.). We are to review the evidence objectively, without a prism that favors the prosecution. *Clewis*, 922 S.W.2d at 134–36; *Thornton v. State*, 957 S.W.2d 153, 157 (Tex.App.—Fort Worth 1997, pet. granted) (noting the similarity between factual review of elements of offense and factual review of evidence in support of affirmative defense).

In accordance with our mandate, I will carefully set out the evidence relevant to the issue and explain my reasons for concluding the jury's finding is factually insufficient. Such analysis provides a "safeguard" against any suggested usurpation of jury function. *Clewis*, 922 S.W.2d at 135–36. In conducting a factual sufficiency review, we are to review the factfinder's weighing of the evidence and are " authorized to disagree with the factfinder's determination." *Id.* at 133.

Dr. Robert Collier testified that he interviewed appellant for an hour and fifteen minutes on August 23, 1995 as part of a court-ordered psychiatric evaluation to determine her competency to stand trial.[1] He measured various aspects of appellant's mental state, from her thought organization and memory function to her groom, posture, mood, and affect. He also reviewed her "psycho-social history," including her family history, but did not interview anyone besides her and her attorney at that time. He noted that appellant's mother had been hospitalized and had probably been given shock treatment, most likely to treat a "severe form of depression." Although he stated there was not a "one-to-one" inheritance, he said the statistics "increase notably" for a child whose mother has severe depression to also have depression.

When asked to explain the information he gathered from his interview, Dr. Collier opined

---

1. Dr. Collier stated he performed approximately two to three competency and insanity evaluations each month for a period of twenty years, and that

he had concluded a person was insane at the time of an offense a distinct minority of the time, in about one out of fifteen to one out of twenty.

She [appellant] presented as a lady that over a several year period had become increasingly depressed in a medical sense, in a major depression sense with recurrent and steadily worse sleep disturbance, fluctuations in appetite and weight, and worst of all, an effect on her thought processes. A degree of depression that I would term psychotic where she became consumed by doom and gloom and saw danger, evil, bad in the world around here [sic], and perceived that as not only the present, but felt helpless and hopeless at changing it and saw that as the present and the future for herself and her two children.

And in my opinion, she presented as a lady with major depression, with psychotic features that had developed over a period of many months, probably a couple of years.

Dr. Collier described major depression as a biological ailment, rather than a psychological ailment, which "actually twists and distorts the person's perceptions of reality" if it is to a psychotic degree. He said appellant perceived the world as "dangerous and evil" for her and her children. Dr. Collier explained that a severely clinically depressed person does not need "psycho-social" issues to become depressed, since the condition is largely biological, but added that several issues likely contributed to her depression: a divorce after a tumultuous marriage, lack of support from the children's father, increasing dependence on her parents, and her inability to work.

Dr. Collier noted symptoms of a steady regression in appellant: she had not worked in several years, was dependent on her parents for financial and emotional support, rarely left the house, and became reclusive. Her weight had fluctuated significantly over two to three years. He indicated that a severely depressed person can maintain "superficial" functionality, and perform such tasks as dressing, eating, putting food on the table, and caring for children. He testified that appellant had told him she was suicidal and "it had been her intent to kill her chil-

dren and herself to spare all three of them from further suffering." Although he had evaluated appellant to determine her competency to stand trial, he also formed an opinion as to her legal sanity during the interview. He stated, "my professional opinion is that at the time of the shooting, the death of her son, she was insane, that she did not know—perceive right, was unable to perceive right from wrong and adhere her conduct to do right due to mental illness."

On cross-examination, he conceded that he could not ascertain appellant's exact thought processes on the day of the crime, but still opined that a person might function normally on a particular day and still not know right from wrong. Dr. Collier acknowledged that a person facing criminal prosecution might be untruthful. He also acknowledged that a person could have a psychotic episode and still be able to determine right from wrong. He stated that appellant told him she did not have the typical symptoms of functional psychosis, such as hearing voices or seeing things that other people did not see.

Dr. David Moron interviewed appellant three times: in October 18, 1995, on September 5, 1996, and then again two weeks later. Like Dr. Collier, he was first appointed by the court to evaluate appellant regarding her competency to stand trial. He interviewed her again after the court appointed him to examine/determine the issue of her sanity or insanity at the time of the offense.[2] The court appointed Dr. Moron, who it described as "my own" expert, because the parties could not agree on a psychiatrist to evaluate appellant on the insanity issue.

In evaluating appellant's competency, Dr. Moron spoke with her and her attorney, then reviewed reports from jail room personnel together with Dr. Collier's report. He observed appellant's disruptive thought processes, her difficulty concentrating, and her "psychomotor retardation," or motionlessness, during the ninety minute interview. Appellant was unable to focus on questions

---

2. Dr. Moron said he had conducted ninety to one-hundred evaluations of criminal defendants. He estimated that he had found approximately half of the one hundred people he had evaluated in a criminal context to be incompetent to stand trial. He said he had evaluated approximately fifty persons on the insanity issue, and had found only two or three to have been insane.

and give answers, and would go off on tangents from the questions posed. He concurred with Dr. Collier that appellant suffered from severe major depressive disorder with a high risk of suicide.

Dr. Moron next testified about his subsequent two-hour interview with appellant to address the insanity issue. To make this evaluation, Dr. Moron also spoke with appellant's parents, her friend, jail room personnel, and reviewed the district attorney's records and those of the state hospital where appellant spent two months.

Dr. Moron learned from appellant's mother that appellant had been depressed for the past few years. She described appellant as being sad, withdrawn, not wanting to talk to anyone, and not doing much more than taking care of the children. Although appellant's condition had improved over time, in the months before the shootings she started to become depressed again. Dr. Moron said a friend of appellant had noticed her physical condition deteriorate considerably in the months before the shootings, typified by her significant weight loss, walking around with her head down, looking extremely depressed and reclusive. He noted that appellant had tried to kill herself at the time of the shootings.[3]

In Dr. Moron's report, which was admitted into evidence, he noted appellant had been concerned about her ex-husband coming back to take her children away. He also reported that appellant's parents had told him that on the night of the shootings, "she looked strange, like she was possessed," and she told her mother "leave me alone dad. I want to die." In the report, Dr. Moron concluded "it is my opinion that Ms. Torres was suffering from a severe mental illness and that, at the time of the incident, she was unable to distinguish right from wrong."

At trial, Dr. Moron again opined that appellant suffered from severe depression which had gone untreated and was aggravated by certain stressors in the time period preceding the shootings. She perceived "all her doors closing in on her," she was suicidal, and believed that shooting the kids would be best for them. He said such beliefs are characteristic of people with severe depression.

On cross-examination, Dr. Moron admitted that, hypothetically, a person with severe depression could be considered sane at the time of an offense, and could know the difference between right and wrong. He also admitted that being charged and having to defend oneself against serious criminal charges could be enough to cause someone to be depressed. He said it takes some organizational skills to get up, load a gun, walk down the hall, and fire at a person, then walk to another room and fire at someone else, then urge a third party not to call police. He also stated that one of appellant's friends who he interviewed, but did not identify, told him appellant "had been doing fairly well" the day before the shooting.

Several laypersons testified about their perceptions of appellant's behavior and other circumstances around the time of the offense. Harlingen Patrol Sergeant Thomas Kimbriel testified he was dispatched to the scene of the crime in the early morning hours on August 7, 1995. When he arrived, appellant was struggling for control of a gun with her father, but before he could wrest it out of her hands, she fired it into the ceiling. He saw appellant "turn the gun on herself" during the struggle. Kimbriel testified that before the gun discharged, she was "yelling, screaming, hysterical," and after it went off, she just fell to the floor and did not say anything. He then handed appellant to an Officer Campbell, who took her to the police station. Kimbriel did not question appellant at the scene because he felt he was too angry and had lost his objectivity towards the situation, so he let an investigator speak with her.

Another Harlingen police officer, Alvaro Garcia, arrived at the scene after Kimbriel and conducted an investigation. He testified about discovering the bloodcovered beds of the children, and indicated a pillow located on one of the children's beds had powder burns on it. He saw appellant only briefly, and could not offer an opinion as to her demeanor at the time.

3. The State maintains the evidence at trial did not establish this assertion.

The chief investigator for the offense, Nazario Martinez, testified that he observed appellant at the city jail after the offense. He described her as "pretty quiet, pretty calm," and "kind of withdrawn." He also observed that there were powder burns on the pillow he recovered from Willie Joe's bedroom.

Appellant's father, Alejandro Flores, testified that he was awakened by his wife in the middle of the night, and discovered his grandsons had been shot. When he called 911, he said appellant told him "don't call the police, Dad." He then struggled for twenty minutes to wrest control of a gun appellant was holding, until police arrived. He indicated that appellant tried to kill herself during the struggle, although he never specifically saw her point the gun at herself.

Mr. Flores testified that, during the three years she lived with he and his wife, he noticed something was wrong with appellant, who acted "like something was bothering her," but he admitted he did not communicate with her much. He said she would behave unusually, doing things like mopping the floor every few days at one in the morning. He said he tried to get control of the gun because he was concerned she would kill herself, although he never saw her point the gun at herself. Mr. Flores also testified that his wife went to the hospital for several years because of a "nervous breakdown," where she saw objects and heard strange noises. His wife was put on medication, and he mentioned she received treatment, which he called "shock nerves," in the head.

Appellant's mother Balina Flores basically reiterated her husband's comments about appellant's depression, and explained some of the family circumstances that contributed to appellant's depression. Mrs. Flores also testified that appellant tried to kill herself on the night of the shootings. According to Mrs. Flores's testimony, after the shootings, appellant told her "she didn't want the kids to suffer anymore and this way they were not going to suffer anymore as well as her." She said appellant told her the kids "got what they deserved," but was not sure what appellant meant.

Appellant's sister Martha Galvan explained that appellant had been forgetful and negative for a period of time, and that she appeared withdrawn, despondent and very depressed. Appellant's friend Aida Cano testified appellant was "always looking down" and was very depressed and that she had lost weight in the months preceding the shootings. Cano also said that appellant indicated she was not sleeping very much.

In the instant case, appellant contends, through expert testimony, that she was so affected by her depression and her perception of the world was so distorted, that she sincerely believed the "right" thing to do was to kill her children in order to spare them from life's cruelty. Appellant contends that the fact that she might consider killing her children as the "right" thing to do, demonstrates she was unable to distinguish right from wrong.

The evidence was uncontroverted that appellant, at the time of the offense, was suffering from severe mental illness. Both psychiatrists who examined appellant concluded she was suffering from severe clinical depression which went untreated until after the shootings. Because medical experts are uniquely capable of testifying as to the existence or absence of appellant's mental illness, and because there was no expert testimony controverting that appellant was mentally ill, the jury was not free to "arbitrarily disregard" the testimony in this respect. *See Graham*, 566 S.W.2d 941, 950 (Tex.Crim.App. 1978) (quoting *United States v. Fortune*, 513 F.2d 883 (5th Cir.1975) (also noting, however, that jurors need not give conclusive effect to expert testimony on the *legal* issue of insanity)); *see also Logan v. State*, 840 S.W.2d 490, 492 (Tex.App.—Tyler 1992, pet. ref'd).

The State argues that certain facts controvert testimony of appellant's mental illness. Upon considering those arguments, it is apparent why the majority did not address them. For example, the State referred to appellant's calm demeanor in jail after her arrest. Any opinions regarding such "calm" demeanor in the days around the incident simply reinforce the medical testimony regarding her depressed state. The State also offers that appellant did not seek treatment

prior to the shootings, and that there was no evidence she ever took medication before as somehow bearing on the credibility of her illness. Rather than undermine appellant, this testimony actually helps explain why her mental state had deteriorated in such an extreme manner. That she was never treated before, but showed improvement after treatment in the state hospital, only buttresses the expert testimony regarding her illness.

I believe the first prong of the insanity defense, that appellant suffered from mental illness, was established by the great weight of the evidence.

Proof of a mental disease or defect alone is not sufficient to establish the affirmative defense of insanity, however. *Schuessler v. State,* 719 S.W.2d 320, 329 (Tex.Crim.App. 1986, en banc), *overruled on other grounds,* 787 S.W.2d 410, 411 (Tex.Crim.App.1990)); *Graham v. State,* 566 S.W.2d at 943. Medically, a person may be insane from a mental disease or defect yet, legally, not be relieved of the criminal responsibility for that crime unless her mental condition reached the point where she was unable to distinguish right from wrong. *Graham,* 566 S.W.2d at 948–50; *McGee v. State,* 155 Tex.Crim. 639, 238 S.W.2d 707, 710 (1950). "Insanity," when used to describe the legal defense, invokes legal and ethical considerations beyond the medical condition. *Graham,* 566 S.W.2d at 948; *Love v. State,* 909 S.W.2d 930, 943 (Tex. App.—El Paso 1995, pet. ref'd).

Although both doctors testified that they did not believe appellant knew the difference between right and wrong, and believed she was legally insane at the time of the offense, their opinion testimony does not establish material facts as a matter of law. *Graham,* 566 S.W.2d at 951 (quoting *Muro v. Houston Fire & Casualty Ins. Co.,* 329 S.W.2d 326 (Tex.Civ.App.—San Antonio 1959, writ ref'd n.r.e.)). As the *Graham* court explained,

[o]nly the jury can join the non-medical components that must be considered in deciding the ultimate issue. That ultimate issue of criminal responsibility is beyond the province of expert witnesses. Were it

otherwise, the issue would be tried in hospitals rather than the courts.

*Graham,* 566 S.W.2d at 949.

When circumstances suggest otherwise, a jury may accept or reject, in whole or in part, the opinion testimony of physicians, and can accept lay testimony over that of experts, regarding the insanity defense. *Taylor v. State,* 856 S.W.2d 459, 468 (Tex.App.—Houston [1st Dist.] 1993, *aff'd on other grounds,* 885 S.W.2d 154 (Tex.Crim.App.1994); *Ward v. State,* 787 S.W.2d 116, 119 (Tex.App.—Corpus Christi 1990, pet. ref'd). Strictly speaking, it is not a question of jurors rejecting uncontroverted expert testimony on the issue, because such determination is actually outside the purview of medical experts. *Graham,* 566 S.W.2d at 952–53; *c.f. Maryland Casualty Co. v. Hearks,* 144 Tex. 317, 190 S.W.2d 62, 64 (1945) ("If the opinions of the experts do not comport with the juror's idea of sound logic, the jurors have a right to say so.").

Given the context, courts acknowledge that the State does not always need to present expert medical testimony to counter defense experts. *Graham,* 566 S.W.2d at 950. Of course, there must be other evidence that tends to controvert a defendant's insanity evidence for a jury for it to reject the defense. As the majority notes, certain circumstances, such as the defendant's actions before and after the incident, may persuade a jury that a defendant knew the difference between right and wrong. *Schuessler,* 719 S.W.2d at 324 (lay witnesses testified defendant did not act strangely in jail after his arrest); *Ross v. State,* 153 Tex.Crim. 312, 220 S.W.2d 137, 139 (1948). Among those circumstances are: lay testimony as to the lucidity of the defendant prior to the commission of the crime, testimony regarding other possible motives for committing a crime, other explanations for erratic behavior, attempts to "eliminate" witnesses or evade police, attempts to conceal incriminating evidence, and expressions of regret for an act and fear of consequences. *See e.g. Schuessler,* 719 S.W.2d at 330; *Graham,* 566 S.W.2d at 951–52; *Murray v. State,* 147 Tex.Crim. 474, 182 S.W.2d 475, 477 (1944); *Love,* 909 S.W.2d at 930; *Patel v. State,* 720 S.W.2d 891, 897

(Tex.App.—Texarkana 1986), *aff'd,* 787 S.W.2d 410 (Tex.Crim.App.1990).

Such circumstances, in my view, are not present in this case. Only by skewing the testimony can the circumstances accumulate against an insanity finding. For example, the majority indicates that both psychiatrists indicated that, hypothetically, a severely depressed person could know right from wrong. However, both doctors strongly believed that the appellant *in this case* could not make that distinction. The majority relies on a notation on Dr. Moron's report that one of appellant's friends told him appellant seemed to be "doing fairly well" the day before the shooting. However, at trial, the bulk of her friend's testimony was that appellant was severely depressed, and distraught in the months preceding the shooting.

The majority also relies on the fact that appellant denied having delusions or hallucinations. Yet it also indicates that she was possibly motivated by a concern that the children's father might take the children away from her, despite the fact that no reference was made to him ever appearing, threatening, or otherwise attempting to do so. Nowhere does the law make the viability of an insanity defense contingent on the presence of hallucinations or psychosis. It is improper to impose such requirements. It is also improper, in my view, for this Court to latch on to a particular quote, when such quote is not representative of the actual testimony given. For example, the hypothetical response of the doctors, and Cano's remark about appellant's appearance on the day before the offense, relative to other days, are not representative of the "great weight and preponderance" of their testimony. The experts presented lengthy testimony about how appellant's actions were not necessarily the result of a hallucination, but were the outgrowth of an advanced state of untreated depression where appellant's entire perception of reality, and consequently right and wrong, was distorted.

The majority refers to appellant having asked her father not to call the police as an indication that she knew what she did was wrong and feared punishment. While one might view her comments in that manner, such conclusions are hardly the only explanation for her comments. If appellant wanted to kill herself, as the evidence suggested she did, it then follows that she would not have wanted her father to call police and have her arrested, as that would frustrate her intentions. Because her comment is subject to different interpretations, it cannot be considered as clear support either way. *Cf. Jackson v. State,* 941 S.W.2d 351, 353 (Tex.App.—Corpus Christi 1997, no pet.) (that defendant asked "How's the guy it hit?" does not necessarily show remorse, as State suggested, but instead merely illustrated his curiosity).

Similarly, appellant's comment that the children "got what they deserved" does not controvert her insanity evidence, and I am confused by the majority's reliance on it. The statement shows, if anything, a lack of remorse and suggests she meant to shoot the kids. It is undisputed that appellant did not accidentally shoot her children. But was her desire to shoot them the product of a criminally responsible mind, or a legally insane mind? The comment is inexplicable when contrasted against the theory pursued by the State: appellant desperately feared losing her children to their father (though he had not expressed an intention to take them), so she shot the children instead, then turned the gun on herself, then indicated the children got what they deserved. It escapes me how these actions and comments, when viewed together, could be viewed as anything other than insane.

The State, and the majority, rely on numerous factors which they contend may have persuaded the jury regarding appellant's sanity. Among them was Officer Garcia's testimony about powder burns on the pillow, which the State suggests demonstrate appellant's attempt to muffle the shots. The majority suggests this showed appellant knew her conduct was wrong. I cannot accept this as a rational inference given that Garcia was not established as a ballistics expert capable of determining the position of guns, nor did he opine, or even suggest, that the pillow was used to muffle any shots. Viewed in its context, his testimony was apparently directed towards establishing that appellant fired the shots at close range, while the children

were asleep; no mention was made of a possible attempt to stifle the pistol's reports. The State did suggest this in its closing argument, but statements by counsel are not evidence, and such a conclusion was not directly supported by any testimony, nor was it a rational inference.

Neither doctor expressed any doubt that appellant was legally insane at the time of the offense, *i.e.* that she did not know right from wrong. *Contrast Ward v. State,* 787 S.W.2d at 117 (defense presented two expert witnesses, but State's expert opined there was no evidence that defendant was insane at time of offense, and that defendant knew his conduct was wrong); *Bradford v. State,* 915 S.W.2d 175, 176 (Tex.App.—Fort Worth 1996, no pet.) (one expert opined defendant was insane, others opined to the contrary); *Pullam v. State,* 709 S.W.2d 42, 44–45 (Tex. App.—Corpus Christi 1986, no pet.) (although testimony was uncontradicted that defendant was mentally ill, expert could not state that defendant did not know his actions were wrong).

The State asserts the jury could have discounted the expert opinions regarding appellant's insanity because a significant amount of time elapsed between the shootings and the interviews. While the length of time between an offense and a psychological evaluation has been considered noteworthy by some reviewing courts, neither the length of time in this case, no attendant circumstances warranted the jury's placing significant weight on this factor in this case, as opposed to those cases. *See, e.g., Graham,* 566 S.W.2d at 952 (defendant's "normal" behavior on day of assault, his excessive drinking, his apologies after assault, and his fear of prosecution supported jury's decision to discount expert testimony to the contrary), *and Brooks v. State,* 719 S.W.2d 259, 261–63 (Tex. App.—Waco 186, pet. ref'd) (two probation officers with psychology degrees who observed defendant immediately prior to assault contradicted expert testimony regarding his sanity). No lay witness opined that

appellant either appeared or acted sane at, or near, the time of the offense. Indeed, all the lay testimony reiterated the doctors' conclusion that appellant was severely depressed.

I consider this case analogous to *Morgan v. State,* 869 S.W.2d 388, 388–89 (Tex.App.—Tyler 1993, pet. ref'd), where three medical experts examined the defendant within weeks of a shooting and all determined that he was afflicted with a severe mental disease which rendered him incapable of knowing his conduct was wrong. The defendant's relatives testified that he was "mentally sick," "withdrawn," and "way out" at the time of the shooting. Although the State offered one psychologist who examined the defendant five months after the shooting and determined he was not legally insane at the time of the shooting, the appellate court reversed the conviction and remanded for a new trial. *Id.; see also Jackson,* 941 S.W.2d at 352–53 (fact of a delusional and mentally ill patient's release from mental institution shortly before offense did not support jury's rejecting compelling evidence in support of insanity plea).

The purpose of the insanity defense issue is to determine whether the accused should be held responsible for the crime, or whether her mental condition will excuse holding her criminally responsible. *Graham,* 566 S.W.2d at 948. In my opinion, the jury placed too much emphasis on tenuous circumstantial evidence of appellant's sanity, and ignored the great weight of the evidence in support of the defense. Now the majority compounds the error by purporting to conduct factual review, but disregarding the great weight of the evidence. The evidence showed that she was undisputedly found incompetent to stand trial (by two psychiatrists and a jury of her peers),[4] she suffered from a severe mental illness, her perceptions of reality were extremely distorted by her illness, and she lost her ability to determine right from wrong.

For these reasons, I would find the verdict against the great weight and preponderance of the evidence and would reverse the convic-

---

**4.** Although the competency and insanity issues are distinguishable (one focuses on mental state at time of trial, and one at the time of the offense), and a finding on competency does not answer the insanity issue, the fact that a person

is deemed incapable of a rational or factual understanding of the proceedings is still probative towards deciding her ability to distinguish between right and wrong at the time of the offense.

tion and remand to the court below for further proceedings.

DORSEY, J., joins.