

# IN THE
# TENTH COURT OF APPEALS

### No. 10-18-00171-CR

**DUNG NGOC THI-ZELUFF,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

### From the 82nd District Court
### Falls County, Texas
### Trial Court No. 9909

## MEMORANDUM OPINION

In this case, appellant, Dung Ngoc Thi-Zeluff, was convicted of capital murder of a person under ten years of age. *See* TEX. PENAL CODE ANN. § 19.03(a)(8) (West 2019). On appeal, Dung contends that the evidence is factually insufficient to establish that she was sane at the time of the murder. We affirm.

# I.    THE AFFIRMATIVE DEFENSE OF INSANITY

In her sole issue on appeal, Dung challenges the factual sufficiency of the jury's rejection of her insanity defense. In other words, Dung contends that she offered so much evidence in support of her insanity defense and the State offered so little evidence rebutting her defense that the jury's rejection of her affirmative defense was against the great weight and preponderance of the evidence. *See Matlock v. State*, 392 S.W.3d 662, 670 n.29 (Tex. Crim. App. 2013) ("Technically, a defendant's claim is not one of 'factual sufficiency.' . . . The defendant is claiming that his evidence is more than sufficient to support his affirmative defense, while the State's evidence is insufficient to rebut it.").

## a.    Standard of Review

In *McAfee v. State*, the First Court of Appeals expressed the standard of review for factual-sufficiency challenges to the rejection of an affirmative defense of insanity as follows:

> The Texas Court of Criminal Appeals has adopted the civil standard of factual-sufficiency review for challenges to the rejection of an affirmative defense because the burden of proof is that of "preponderance of the evidence," the same burden applied in civil proceedings. *Id.* at 671 (citing *Meraz v. State*, 785 S.W.2d 146, 149, 153-55 (Tex. Crim. App. 1990)). In making a factual-sufficiency claim, the defendant is asserting that, considering the entire body of evidence, the jury's adverse finding on his affirmative defense was so "against the great weight and preponderance" of the evidence as to be manifestly unjust. *Id.*
>
> Accordingly, we must view the entirety of the evidence in a neutral light. *Id.* However, we "may not usurp the function of the jury by substituting [our] judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony." *Id.* We may "sustain a

defendant's factual-sufficiency claim only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, [we] clearly state[] why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id.* If we determine that the evidence supporting an affirmative defense so greatly outweighs the State's contrary evidence that the verdict is manifestly unjust, then we may reverse the trial court's judgment and remand for a new trial. *Id.* at 672.

Insanity is an affirmative defense, which must be proved by a preponderance of the evidence. TEX. PENAL CODE ANN. §§ 2.04, 8.01 [West (2011)]. To establish the affirmative defense of insanity, the defendant must prove "that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." *Id.* § 8.01(a). The law presumes that the accused is sane, and the accused bears the burden of proving by a preponderance of the evidence that he is insane. *Martinez v. State*, 867 S.W.2d 30, 33 (Tex. Crim. App. 1993); *see Ruffin v. State*, 270 S.W.3d 586, 591-92 (Tex. Crim. App. 2008) ("Texas law . . . presumes that a criminal defendant is sane and that he intends the natural consequences of his acts.").

The insanity defense focuses on whether the accused understood the nature of his action and whether he knew he should not do it. *Ruffin*, 270 S.W.3d at 592; *Bigby v. State*, 892 S.W.2d 864, 877-78 (Tex. Crim. App. 1994). In the context of the insanity defense, the word "wrong" means illegal. *Ruffin*, 270 S.W.3d at 592. If the accused knows that his conduct is "illegal" by societal standards, then he understands that his conduct is wrong, even if, due to a mental disease or defect, he thinks his conduct is morally justified. *See id.* Thus, proof of a mental disease or defect alone is not sufficient to establish an affirmative defense of insanity. *Nutter v. State*, 93 S.W.2d 130, 132 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *see Bigby*, 892 S.W.2d at 877-78 ("The issue of insanity is not strictly medical. It also involves both legal and ethical considerations.").

Although jurors may not arbitrarily disregard expert testimony as to insanity, neither may they give conclusive effect to such testimony. *Graham v. State*, 566 S.W.2d 941, 950-51 (Tex. Crim. App. 1978) ("Opinion testimony does not establish material facts as a matter of law."). The circumstances of the crime itself are also important in determining the mental state of the

accused at the time of the commission of the offense, and evidence indicating knowledge of wrongful conduct, such as an attempt to conceal incriminating evidence or elude law enforcement, may be considered. *Id.* at 951; *see also Torres v. State*, 976 S.W.2d 345, 347-48 (Tex. App.—Corpus Christi 1998, no pet.) (holding that, in reaching its decision on insanity, jury may consider circumstantial evidence, including defendant's demeanor before and after committing crime, defendant's attempts to evade police or conceal incriminating evidence, defendant's expressions of regret or fear of consequences of his actions, and any other possible explanations for defendant's behavior).

Whether the defense of insanity was proved is a decision that lies within the province of the jury, both as to credibility of witnesses and the weight of the evidence and as to the limits of the defense. *Bigby*, 892 S.W.2d at 878; *see also Reyna v. State*, 116 S.W.3d 362, 367 (Tex. App.—El Paso 2003, no pet.) ("The issue of insanity at the time of the offense lies within the province of the jury, and we will overturn its decision only where insanity is undisputed or resolved to one end of the spectrum outside the realm of discretion.").

467 S.W.3d 622, 636-37 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd).

b.    **Discussion**

On the night of Halloween 2016, Dung; Dung's mother, Oanh Thi-Nguyen; and Dung's daughter, five-month old Emily, were watching television in the home of Dung and her husband, William, in rural Travis, Texas. Oanh recalled that Dung and William had gotten into a fight over William's purported marihuana usage; however, Dung was acting normal. At some point that evening, Dung took Emily to a bedroom, closed and locked the door to the bedroom, and attempted to change Emily's diaper, despite directives from both William and Child Protective Services ("CPS") that she never be allowed alone or unsupervised with Emily. While in the locked bedroom, Dung

strangled Emily until she was dead. Afterwards, Dung sat with Emily in a rocking chair until William came home and discovered the lifeless body of Emily. William began CPR until medical personnel and law enforcement arrived.

Among the law enforcement that arrived at the scene of the murder were Texas Ranger Patrick Pena; Richard Aleman Jr., the then Falls County Constable, Precinct 3; and Michael Ferguson, a Texas Game Warden in Falls County. Former Constable Aleman recalled that, upon arriving at the scene, Dung "didn't have a demeanor. Very, I call stone-faced; just blank." Game Warden Ferguson concurred, testifying that he saw Dung sitting in a chair in the garage and that she "was real quiet and not saying a lot. What little bit that I could, when I initially got on the scene, could understand, just real quiet and asked where the baby was, I think." Warden Ferguson spoke with Dung and observed that she "was coherent, for sure; able to have a dialogue; and we were able to speak through the translation line." According to Warden Ferguson, Dung was unable to remember what happened to Emily.

Based on his investigation, Ranger Pena recounted that it was uncommon for the door to the bedroom where Emily was killed to be locked. He also learned that, after killing Emily, Dung removed two wedding rings and placed them on an end table because "she no longer felt like a good mother or a wife." This information led Ranger Pena to believe that Dung knew that murdering Emily was wrong. Dung was placed under arrest for the murder of Emily.

A few days later, on November 3, 2016, Ranger Pena interviewed Dung. During the interview, Dung explained, in great detail, how she killed Emily and described the act as "evil." Dung also indicated that she had urges or thoughts to harm Emily on several other occasions. She also acknowledged having two abortions in the past because she did not think she could take care of the children. Additionally, Dung noted that she was involved in a car accident a few days before the killing and sustained minor injuries, including a "goose egg" on her head. Ranger Pena found it interesting that Dung only asked two questions during the three-hour interview—what the penalty was going to be for her crime and the amount of money she needed to bond out of jail.

Ranger Pena also recounted that, during the interview, Dung "never wiped a tear from her eye. There was a box of tissue next to her that I provided to her. She never used one. I never saw a tear. She just whined." He believed that Dung was trying to fake emotions. Ranger Pena noted that Dung did not look like someone who was depressed, though she expressed some remorse. He did not see or hear anything indicating that Dung did not know that killing her daughter was wrong. Ranger Pena based this conclusion on the following facts:

It's kind of a hard turn.

> Before the Defendant took Emily to the bedroom, the Defendant's mother stated that everything was normal, she was even playing with Emily inside the bedroom; before the grandmother walked back out of the bedroom, everything seemed normal.

Another thing that concerned me was, during the interview, before she choked Emily, she told me—at first she told me she told Emily, but later on, she didn't actually say it verbally but she thought it, she apologized to Emily because she's about to act crazy.

And again, this is just me speaking in my investigations. A truly crazy person doesn't know they are about to act crazy. But she apologized to Emily just before doing it. That's the second thing.

The third thing is when Emily's father came in the bedroom and found Emily dead and tried to perform CPR, the Defendant admitted to me she took her wedding rings off. So she knew what she did was wrong. She no longer felt like a mother and a wife.

So in my investigative experience and opinion before, during, and after, she knew what she was doing.

. . .

And she did lock the door. And I learned, after conducting the other interviews, that that was very uncommon for the door to be locked.

Accordingly, Ranger Pena concluded that Dung intentionally killed her daughter and that there was no indication that she did not know what she was doing.

Oanh testified that CPS told Dung that she was not supposed to be alone with Emily because they were afraid Dung would hurt Emily.[1] The record reflects that Dung had made numerous threats to harm herself and Emily in the past. These threats usually coincided with fights Dung had with William. The record also shows that Dung had attempted to commit suicide on a couple of occasions because she was depressed and

---

[1] Specifically, Oanh stated that Dung "is not normal" because "sometimes she can be on and sometimes she can be off. Dung, you know, I know her. She under the pressure, very stressful, she cannot control herself."

often upset about her relationships with William or other men. These suicide attempts resulted in Dung being hospitalized in 2010 at the Austin State Hospital and in 2016—both of which resulted in Dung being released.

Phuong Do and Thuy Duong Thi Do, Dung's brother and sister, both testified regarding Dung's "up and down" behavior and the prescription drugs that Dung took. Specifically, Dung took Senimet for Parkinson's-like tremors and depression medicine; however, prior to Emily's death, Dung stopped taking her depression medicine because she was breastfeeding Emily. Phuong and Thuy both recalled Dung's prior suicide attempts, describing one incident as Dung cutting her hand and throat and the other as Dung ingesting a whole bottle of Tylenol. With both suicide attempts, Dung called either a friend or the police to rescue her. In fact, according to William Derrick Johnson, Chief Deputy for the Falls County Sheriff's Office, Dung was well-known to police, as she frequently called when she got depressed. Witnesses testified that this usually coincided with troubles Dung had in her relationships with men. Thuy described Dung as having depression problems when she gets in a relationship with a man and that Dung regularly fought with her father because she likes to have things her way. In one incident, Dung used her car to ram the gate of a man who broke up with her.

Both Phuong and Thuy acknowledged that Dung admitted to killing Emily and that Dung did not claim that she blacked out, hallucinated, heard voices, or saw things that made it necessary to kill Emily. Rather, both Phuong and Thuy believed that Dung

killed Emily because Dung did not believe that she could be a good mother, William purportedly threatened to take Emily away, and because Dung did not approve of William's nephew living with the couple.

Chastity Brock, a Child Protective Services caseworker, recounted that, in August 2016, CPS received allegations that Dung had made threats to harm herself and Emily. Brock later discovered that Dung "had made multiple threats to harm her child throughout the course of her pregnancy and since the child was born in May." When Brock first arrived, Dung "was in the hospital for the threats that she had made to herself and her child." Brock noted that Dung was hospitalized for the first part of CPS's open case and that it was for "[s]uicide and homicidal ideations." CPS went along with a family safety plan put in place by William that prohibited Dung from being alone or unsupervised with Emily.

Brock also recalled that Dung had slight tremors, but Brock did not observe Dung to be delusional or suffering from hallucinations. Brock did not see anything in the home or glean from her conversations with Dung that made her think that someone was suffering from a severe mental disease or defect. Brock emphasized to everyone involved that Dung needed to be supervised at all times when she interacted with Emily.

Dr. Robert Edward Cantu testified as Dung's expert witness. Dr. Cantu, a psychiatrist, did an evaluation of Dung in March 2017. Dr. Cantu recounted Dung's medical history, including her use of Senimet for Parkinson's symptoms and another

drug for depression.  He also noted Dung's hospitalization at the Austin State Hospital in 2010 and her more recent hospitalization at Scott & White Hospital in 2016, when she was eight months pregnant.  Dung's 2016 hospitalization was due to William complaining that Dung threatened him, attacked him with a knife, and made threats to kill herself and her baby while hitting herself in the stomach.  After giving birth, Dung was hospitalized again in late August 2016, for threatening to kill herself and Emily; however, she was released a day or two later because she denied saying those things. Dung was ordered to follow up with psychiatry two weeks later.

On September 1, 2016, imaging of Dung's brain was done, and it revealed abnormalities in Dung's brain that are characteristic of Parkinson's disease.  Dr. Cantu also spoke to Dung about the collision that transpired just prior to the killing.  Dung told Dr. Cantu that she intentionally drove her car off the road to kill herself, though she denied this to other medical professionals.  As a result of the collision, Dung was prescribed Tylenol 3 with codeine, which is a narcotic that can cause people to "become more depressed or more aggressive."  When asked about his general diagnosis for Dung, Dr. Cantu stated the following:

> Okay.  So in this letter, I outline what I think Ms. Zeluff's psychiatric diagnoses are.
>
> And at that time, to an extent, I still do believe that she had severe major depressive disorder; she also had parkinsonian—Parkinson's disease, and I believe that that was aggravating her depression and—and her ability to think clearly.

I didn't, at that time, put that I believe that she had side-effects from her Senimet that were also contributing to her state of mind on or about the offense.

And I also believed at the time, again, of the offense, that she was suffering from postpartum depression and psychosis, which overlaid her regular depression and just made everything worse.

Regarding Dung's insanity defense, Dr. Cantu testified:

So, with regard to—I—I believe that there's very little doubt that she has several serious mental illness diagnoses.

The second part of the statute has to do with whether or not the person knew that the conduct was wrong. Wrong's defined in several ways. *It's clear, my record, from the record of the DPS people, that Ms. Zeluff, when asked, knew that the –killing her baby was criminally wrong.*

. . .

And as I've mentioned, I believe that at the time of the offense, Ms. Zeluff was psychotic; specifically, that she was delusional. Because she told me and she has told other people in the record that she believed that because she couldn't care for the baby, that the best option for the baby was to be dead.

(Emphasis added). However, Dr. Cantu did conclude that Dung could not appreciate the moral subjective wrongness of killing Emily. He also clarified:

Now, again, this doesn't make sense if you're not delusional. But, again, if in your delusion that you believe that the only option, the only possible thing to do is to kill your baby because you can't take care of it, it does make sense to somebody who's delusional, i.e., somebody who's psychotic.

He also acknowledged that, in the video of her confession to police, Dung demonstrated how she choked Emily and stated that she locked the door of the bedroom, so no one would interrupt or interfere with her. Dr. Cantu described the symptoms of

psychosis as being hallucinations, delusions, and/or disorganized thinking. He further explained that disorganized thinking "is where one can't put together their thinking well enough to complete normal tasks." However, on cross-examination, Dr. Cantu admitted that nowhere in Dung's medical records was she diagnosed with or complained about having hallucinations or being delusional. And with regard to disorganized thinking, Dr. Cantu conceded that, if Oanh was correct in that Dung could change Emily's diaper on the night of the killing, then Dung would not have had disorganized thinking on the night in question. Rather, according to Dr. Cantu, Dung's actions of taking Emily, changing her diaper in another room, locking the door to the room, and killing Emily did not sound like disorganized thinking. Dr. Cantu agreed that this sounded "like a plan you start and you finish."

Dr. Cantu agreed that the medical record also contains notations that Dung's suicide attempts may be characterized as attention-seeking and that Dung was possibly manipulating William. Indeed, some of Dung's threats regarding Emily were made because she was upset with William working all of the time and for moving the family from Brenham, Texas. Furthermore, Dr. Cantu recognized that the medical records also indicate that, in June 2016, Dung was put back on Senimet after having Emily and that her doctors noted that she was doing better.

Dr. William Lee Carter, a psychologist, testified that he did two separate psychological examinations of Dung—one on August 7, 2017, and another on April 17,

2018. Dung told Dr. Carter that she knew that she was not supposed to be alone with Emily and that she decided to kill Emily while William was away from home because he would stop her. Dung reiterated that she locked the door to the bedroom because she was afraid of being stopped by her mother while killing Emily. Dung denied feeling suicidal when she was alone in the bedroom with Emily. Dung admitted that she knew that choking Emily by the neck would kill her and that the act of doing so was wrong. After killing Emily, Dung "had no feeling at all" and made no attempt to try to revive her in any way. Instead, Dung held Emily while sitting in a rocking chair. Dung explained that she was not thinking anything at all at this time, and she denied wanting to die herself. Dung expressed that she wanted to apologize to Emily, if she could speak to her right now. And when Dr. Carter asked Dung why she was in jail, Dung stated that "she knew she was in jail for killing her daughter."

After reviewing all of the medical records and the case record, including his examinations of Dung, Dr. Carter formed the following opinion:

> My opinion is that before this act, she planned what she was doing; she knew what she was doing was wrong; and she knowingly killed her daughter, and she did so recognizing that she was breaking the law.
>
> Therefore, my opinion is that she was sane at the time of Emily Zeluff's death.
>
> . . .
>
> There is no question whatsoever that she is a severely psychologically disturbed woman. I have no questions whatsoever about that issue.

. . .

My opinion is that she has a personality disorder. I diagnosed a borderline personality disorder, which is a disorder regarding identity. You know, we all ask that question: Who am I?

Individuals who have borderline personality disorder commonly have a lot of trauma and stress and so forth in their personal history. And I certainly had reason to believe she had a lot of trauma in her history, not only from her origins, living in poverty in a third-world country; coming over here being involved in a number of relationships, some of which were bad; losing her own daughter, frankly, is a form of trauma that I'm sure influences her right now.

But as she asks that question: Who am I? She does not come up with good, palpable answers.

People with borderline personality disorder oftentimes are suicidal, repeatedly. They oftentimes engage in acts of self-harm. They oftentimes engage in self-harm or erratic behavior as a manipulative means or as a way of overstating their emotional distress.

And so that's what my sense here is about her.

Borderlines do not have a lack of contact with reality. And I do not believe she has a lack of contact with reality.

Based on the foregoing, we conclude that there was sufficient evidence from which the jury could determine that Dung was aware at the time she murdered Emily that her conduct was wrong. *See* TEX. PENAL CODE ANN. § 8.01(a); *Ruffin*, 270 S.W.3d at 592 (noting that "wrong," in the context of an insanity defense, means "illegal" by societal standards); *Bigby*, 892 S.W.2d at 877-78 (stating that the insanity defense focuses on whether the accused understood the nature of her action and whether she knew she should not do it);

*see also McAfee*, 467 S.W.3d at 639. Specifically, the evidence showed that Dung took the precise actions of waiting until William left the house to take Emily into another bedroom, lock the bedroom door to avoid interference, and strangle Emily. *See Graham*, 566 S.W.2d at 951 (noting that the circumstances of the crime itself are important in determining the mental state of the accused at the time of the commission of the offense); *see also Ruffin*, 270 S.W.3d at 591-92 (noting that Texas law presumes that a criminal defendant is sane and intends the natural consequences of her actions). Afterwards, Dung removed her wedding rings and indicated that she was not a good mother or wife. *See Torres*, 976 S.W.2d at 347-48 (holding that, in reaching its decision on insanity, the jury may consider circumstantial evidence, including defendant's demeanor before and after committing crime, defendant's attempts to evade police or conceal incriminating evidence, defendant's expressions of regret or fear of consequences of his actions, and any other possible explanations for defendant's behavior). The record also shows that Dung made numerous threats to harm the baby when she had conflicts with William because she liked to get her way. Furthermore, Dung admitted to numerous people, including Drs. Cantu and Carter that it was wrong for her to kill Emily. Moreover, Dung asked Ranger Pena, during the interview a few days after the killing, what the penalty was going to be for her crime and the amount of money she needed to bond out of jail. *See id.*

And while it appears that Dung is a severely, psychologically-disturbed woman and that Dung has taken several prescribed drugs at varying times to treat her physical

and mental issues, we emphasize that mental disease or defect alone is not sufficient to establish the affirmative defense of insanity and that the determination as to whether the defense of insanity was proven is a decision that lies within the province of the jury and will not be overturned unless "insanity is undisputed or resolved to one end of the spectrum outside the realm of discretion." *Reyna*, 116 S.W.3d at 367; *see Bigby*, 892 S.W.2d at 878; *see also Nutter*, 93 S.W.3d at 132 (noting also that lack of memory is not enough to establish insanity at the time of the offense). Additionally, we are not persuaded by Dung's insistence that Dr. Cantu's testimony conclusively established her insanity defense as a matter of law by virtue of him being both a psychiatrist and a medical doctor.[2] *See Torres*, 976 S.W.2d at 347 ("Expert testimony on the issue of appellant's ability to determine right from wrong does not establish insanity as a matter of law. In fact,

_____

[2] We are also not persuaded by Dung's reliance on *Morgan v. State*, 869 S.W.2d 388, 388-89 (Tex. App.—Tyler 1993, no pet.). In *Morgan*, the Tyler Court of Appeals concluded that the defendant proved the affirmative defense of insanity by a preponderance of the evidence based on the testimony of three medical doctors with specialties in psychiatry and several relatives who noted that the defendant suffered from severe mental disease, was "mentally sick," "withdrawn," "way out," and, thus, could not know that his conduct in shooting the victim was wrong. *Id.* at 388-39. The *Morgan* Court concluded that this testimony outweighed the expert opinion of the State's psychologist. *Id.* at 389.

Unlike *Morgan*, Dung's expert witness, Dr. Cantu specifically noted that the record shows that Dung knew that killing Emily was "criminally wrong." That was enough for the jury to conclude that Dung understood the nature of her action and that she knew she should not have done it. *See Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008); *Bigby v. State*, 892 S.W.2d 864, 877-78 (Tex. Crim. App. 1994); *see also McAfee v. State*, 467 S.W.3d 622, 639 (Tex. App.—Houston [1st Dist.] pet. ref'd). And to the extent that Dr. Cantu's testimony, as well as the testimony of Dung's relatives, conflicts with the State's evidence, we note that such conflicts were within the province of the jury to resolve and that Dung's evidence does not so greatly outweigh the State's contrary evidence that the verdict was manifestly unjust. *See Matlock v. State*, 392 S.W.3d 662, 671-72 (Tex. Crim. App. 2013); *Bigby*, 892 S.W.2d at 878; *Graham v. State*, 566 S.W.2d 941, 943 (Tex. Crim. App. 1978); *Reyna v. State*, 116 S.W.3d 362, 367 (Tex. App.—El Paso 2003, no pet.); *Torres v. State*, 976 S.W.2d 345, 347 (Tex. App.—Corpus Christi 1998, no pet.).

while expert testimony may be helpful to a jury, the issue of insanity is outside the purview of medical experts and should be left to the discretion of the trier of fact." (citing *Graham*, 566 S.W.2d at 943)). Accordingly, we cannot conclude that the evidence supporting Dung's affirmative defense so greatly outweighs the State's contrary evidence that the jury's verdict was manifestly unjust. *See Matlock*, 392 S.W.3d at 671-72. We overrule her sole issue on appeal.

## II. CONCLUSION

We affirm the judgment of the trial court.


JOHN E. NEILL
Justice


Before Chief Justice Gray,
     Justice Davis, and
     Justice Neill
Affirmed
Opinion delivered and filed July 3, 2019
Do not publish
[CRPM]

