**Cody Dewayne MITTEN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–00–303–CR.**

Court of Appeals of Texas, Corpus Christi.

June 13, 2002.

Lane W. Vaughn, Roy G. Romo, Houston, for appellant.

P. 'Dexter' Eaves, Dist. Atty., Victoria, for state.

OPINION

NELDA V. RODRIGUEZ, Justice.

A jury found appellant, Cody Dewayne Mitten, guilty of capital murder, thereby implicitly rejecting his affirmative defense of insanity. The State did not elect to seek the death penalty, and the trial court assessed punishment at life imprisonment in the Texas Department of Criminal Justice, Institutional Division. By four issues, Mitten complains of (1) the jury's implicit finding that he was not insane at the time of the offense; (2) the trial court's refusal to suppress his written statement; (3) the admission of an incriminating oral statement made during a competency examination; and (4) the court reporter's failure to transcribe and transmit a complete record of the proceedings. By two additional issues, Mitten complains of ineffective assistance of counsel. We affirm.

On the evening of August 2, 1997, Mitten, accompanied by his mother, Candelaria Mitten (Candy) and a man believed to be Larry Sifford, went to the emergency room of Citizens Medical Center in Victoria, Texas, for treatment. Dr. David Blanchard, the emergency room doctor, examined Mitten whose chief complaint was he was tired and weak; he had a general feeling of malaise. Mitten also reported "not eating or drinking right." While Dr. Blanchard did not remember talking with the woman regarding Mitten's health, the man did voice the same concerns Mitten expressed. Dr. Blanchard testified Mitten maintained direct eye contact with him during their discussion. Mitten was discharged and instructed to follow up with a physician if the feelings continued.

Later that evening, Mitten was watching television and eating ice cream with his mother and Sifford.[2] He went into the kitchen, picked up a knife, walked back into the living room and stabbed Sifford and his mother. Mitten pulled the telephone from the wall. He put his mother's body in the back seat of Sifford's vehicle and drove around the Victoria area for several hours. Mitten eventually drove to the emergency room of Brooke Army Medical Center in San Antonio, and asked for help. Mitten carried his mother's body inside where she was pronounced dead.

Several San Antonio police officers were called to the hospital. While at the hospital, Mitten made an exculpatory oral statement to Detective Edward Giddings and Sergeant Larry DeHaven of the San Antonio Police Department. Mitten stated he was visiting his mother and Sifford at his mother's home in Victoria. They were watching television when Mitten heard his mother gasping for air. Turning around, he saw that Sifford had stabbed his mother in the chest. Mitten said he took the knife out of his mother and stabbed Sifford. When the Victoria County Sheriff's Office was notified regarding the existence of a dead body at Candy's home, a deputy responded and found the body that was later identified as Sifford. Mitten was taken to the police station where he gave a written statement which conflicted with his earlier oral statement.

On August 4, 1997, Dr. Blanchard again saw Mitten in the emergency room at the Citizens Medical Center. Mitten complained of a seizure he had at the Victoria County Jail. Dr. Blanchard observed Mitten was much the same as he had been when he was seen on August 2, 1997, with the aspect that Mitten had a "flat affect." Mitten told Dr. Blanchard he deliberately caused the seizure by holding his breath. Dr. Blanchard did not notice any confu-

---

**2.** This factual account of the incident is taken from Mitten's written statement.

sional state or anything inappropriate for someone just having had a seizure.

At trial, both the defense and the State called expert witnesses to testify regarding Mitten's legal sanity at the time of the murders. Although the doctors did not agree on a specific diagnosis, they agreed Mitten had some form of psychosis.[3]

The defense presented Dr. Gary Aitcheson, a psychiatrist who conducted an interview with Mitten on January 21, 2000, and reviewed medical records from Vernon State Hospital dated March 1998 to June 1998. Psychiatrist, Dr. Robert Lyman, also testified for the defense. Dr. Lyman examined, evaluated and treated Mitten beginning a few days after Mitten was arrested. Drs. Aitcheson and Lyman concluded Mitten was legally insane at the time of the offense.

Dr. Richard Coons, a psychiatrist, and Dr. John Quinn, a forensic psychologist at Vernon State Hospital, were called as expert witnesses for the State. Dr. Coons evaluated Mitten on September 22, 1998, and while he did not offer an opinion on Mitten's sanity, stated there was information suggesting Mitten knew his conduct was wrong. This information included (1) typical family behavior just before the stabbings, (2) an inference that Mitten was attempting to hide something when he pulled the phone line from the wall, and (3) Mitten's exculpatory statement claiming Sifford stabbed his mother. Dr. Quinn saw Mitten as a patient at Vernon State Hospital for approximately two and a half months, from March 3, 1998, to May 22, 1998. He also conducted an evaluation of

Mitten to determine his competency to stand trial. Dr. Quinn did not offer an opinion on the issue of insanity.

## I. Insanity Defense

By his first issue, Mitten presents a factual sufficiency challenge. He complains that the jury's implicit rejection of his insanity defense was so against the great weight and preponderance of the evidence that its guilty verdict was manifestly unjust.

### A. Standard of Review

■ In examining the factual sufficiency of the evidence supporting the affirmative defense of insanity, we consider all the evidence relevant to the issue to determine whether the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Bigby v. State*, 892 S.W.2d 864, 875 (Tex.Crim. App.1994); *Meraz v. State*, 785 S.W.2d 146, 155 (Tex.Crim.App.1990); *Torres v. State*, 976 S.W.2d 345, 347 (Tex.App.-Corpus Christi 1998, no pet.); *see Johnson v. State*, 23 S.W.3d 1, 7 (2000) (great weight and preponderance of evidence standard is standard properly utilized when appellant has burden of proving affirmative defense by preponderance of evidence, and on appeal hopes to demonstrate state of evidence preponderates greatly against jury's finding).

### B. Legal Insanity

■ A defendant cannot be convicted of a criminal offense if he is legally insane at

---

**3.** The testifying psychiatrists revealed Mitten exhibited behaviors characteristic of schizophrenia, schizophreniform, or a brief psychotic break. The distinction made between these diagnoses is the duration of the mental illness, and symptoms of the last two diagnoses are not inconsistent with the first. According to Dr. Gary Aitcheson, a brief psychotic disorder occurs when a person is psychotic for less than one month, schizophreniform is a disorder with symptoms that last less than six months, and schizophrenia is a disorder with symptoms remaining for a six-month period. At the time of the incident, Mitten did not have the six-month history that would allow for the diagnosis of schizophrenia.

the time of the crime. *See* TEX. PEN.CODE ANN. § 8.01(a) (Vernon 1994).

There is a distinction between medical insanity and legal insanity within the meaning of Section 8.01. The existence of a mental disease alone is not sufficient to establish legal insanity unless the accused was mentally ill to the point that he did not know his conduct was wrong.

*Plough v. State*, 725 S.W.2d 494, 500 (Tex. App.-Corpus Christi 1987, no pet.).

 "The purpose of the insanity defense issue is to determine whether the accused should be held responsible for the crime, or whether his mental condition will excuse holding him responsible." *Graham v. State*, 566 S.W.2d 941, 948 (Tex.Crim. App.1978). Ultimately, this issue lies within the province of the jury, not only as to the credibility of the witnesses and weight of the evidence, but also as to the limits of the defense itself. *Bigby*, 892 S.W.2d at 878; *Graham*, 566 S.W.2d at 952; *Maestas v. State*, 963 S.W.2d 151, 156 (Tex.App.-Corpus Christi 1998), *aff'd*, 987 S.W.2d 59 (Tex.Crim.App.1999); *Torres*, 976 S.W.2d at 347; *see* TEX.CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979).

The authority granted in *Clewis* [*v. State*, 922 S.W.2d 126, 133 (Tex.Crim. App.1996)] to disagree with the fact finder's determination is appropriate only when the record clearly indicates such a step is necessary to arrest the occurrence of a manifest injustice. Otherwise due deference must be accorded the fact finder's determinations, particularly those determinations concerning the weight and credibility of the evidence.

*Johnson*, 23 S.W.3d at 9. "[W]e must remain appropriately deferential to the trial court so as to avoid this Court substituting its judgment for that of the factfinder." *Torres*, 976 S.W.2d at 347 (citing *Clewis*, 922 S.W.2d at 133). Any inconsistencies in the evidence are resolved in favor of the verdict. *Id.*

 Because the circumstances of a crime are always important in determining the mental state of the accused at the time of the offense, *Graham*, 566 S.W.2d at 951, the trier of fact may consider such evidence as the appellant's demeanor before and after the offense, attempts to evade police, attempts to conceal incriminating evidence, expressions of regret or fear of the consequences of his actions, other possible motives for the offense, and other explanations for his behavior. *Aschbacher v. State*, 61 S.W.3d 532, 535 (Tex.App.–San Antonio 2001, pet. ref'd) (citing *Torres*, 976 S.W.2d at 347–48). Moreover, because the insanity issue is not strictly medical,

expert witnesses, although capable of giving testimony that may aid the jury in its determination of the ultimate issue, are not capable of dictating determination of that issue. Only the jury can join the non-medical components that must also be considered in deciding the ultimate issue. That ultimate issue of criminal responsibility is beyond the province of expert witnesses. Were it otherwise, the issue would be tried in hospitals rather than in the courts.

*Graham*, 566 S.W.2d at 949. Furthermore, it is not necessary for the State to present expert medical testimony that a defendant is sane in order to counter the defense experts testimony regarding insanity. *Id.* at 950. While a jury may not arbitrarily disregard expert testimony on the legal issue of insanity, it also may not give conclusive effect to the opinion merely because it is not challenged by some other expert. *Id.* (quoting *United States v. Fortune*, 513 F.2d 883, 890 (5th Cir.1975)). Therefore, when circumstances suggest otherwise, a jury may accept or reject, in whole or in part, the opinion testimony of a

witness, and may even accept lay testimony over that of experts. *See id.* at 952; *Preston v. State,* 457 S.W.2d 279, 280 (Tex. Crim.App.1970); *Ward v. State,* 787 S.W.2d 116, 119 (Tex.App.-Corpus Christi 1990, pet. ref'd).

### C. Analysis

 In support of his insanity defense, Mitten elicited testimony from family members regarding instances of unusual behavior during the weeks preceding the murders. Medical expert witnesses testified, and while the experts may have agreed that, at the time of the murders, Mitten suffered from some form of mental disorder, there was controverting evidence regarding the issue of legal insanity. Mitten made an exculpatory oral statement that conflicted with his written statement. The evidence also reveals that when Mitten used the phone while detained at the police department, he wrapped it with his shirt. This gave the sergeant the impression that Mitten did not want to leave his fingerprints on the phone. Further, Dr. Blanchard examined Mitten the evening of the murders and two days afterwards, and reported nothing significant regarding his behavior. Finally, four days after the incident, Cody commented to an officer that "[he] loved his mother to death and [he] guess[ed] [he] just got jealous."

Considering all the evidence relevant to the legal insanity issue, we conclude there is evidence in this case indicating Mitten was legally sane at the time he stabbed the victims to death with a butcher knife. The record shows controverting evidence as to whether Mitten knew the difference between right and wrong. A rational trier of fact could have resolved the conflicting testimony regarding legal insanity against Mitten. It was possible for the jury to have rejected, in whole or in part, the expert opinion testimony of the defense's experts and interpreted the circumstances

surrounding the crime, including Mitten's statements and testimony provided by lay witnesses, as evidence of Mitten's knowledge that his conduct was wrong. *See Graham,* 566 S.W.2d at 952; *Preston,* 457 S.W.2d at 280; *Ward,* 787 S.W.2d at 119; *see also Aschbacher,* 61 S.W.3d at 535 (citing *Torres,* 976 S.W.2d at 347–48). The jury's rejection of Mitten's insanity defense was not beyond the discretion afforded to the jury to decide this issue. *See Graham,* 566 S.W.2d at 952.

We therefore conclude the evidence is factually sufficient to support the jury's finding as it is not so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Bigby,* 892 S.W.2d at 875; *Meraz,* 785 S.W.2d at 155; *Torres,* 976 S.W.2d at 347; *see also Johnson,* 23 S.W.3d at 7. Mitten's first issue is overruled.

### II. Challenge to Admission of Written Statement

 By issue two, Mitten contends his written statement, in which he confesses he stabbed his mother and Sifford, should not have been admitted at trial because the State failed to sufficiently establish that he knowingly, intelligently or voluntarily waived his right to counsel before making the statement.

 Generally, we review evidentiary rulings under an abuse of discretion standard. *McVickers v. State,* 874 S.W.2d 662, 664 (Tex.Crim.App.1993). A trial court abuses its discretion when it acts without any guiding rules or principles, or acts arbitrarily or unreasonably. *Montgomery v. State,* 810 S.W.2d 372, 378–80 (Tex.Crim.App.1990). A witness's testimony can be rejected or accepted by the trial court. *Ashcraft v. State,* 900 S.W.2d 817, 824 (Tex.App.-Corpus Christi 1995, one pet. ref'd & one pet. dism'd) (citing *Kelly*

*v. State,* 621 S.W.2d 176, 179 (Tex.Crim. App.1981)). Moreover, when there is controverted evidence, the trial court is the sole trier of facts and the exclusive judge of the witness's credibility and the weight given his testimony. *Ashcraft,* 900 S.W.2d at 823–24 (citing *Muniz v. State,* 851 S.W.2d 238, 252 (Tex.Crim.App.1993)); *Jacobs v. State,* 787 S.W.2d 397, 400 (Tex. Crim.App.1990); *McCoy v. State,* 713 S.W.2d 940, 955 (Tex.Crim.App.1986).

■■■■ To meet constitutional standards, a confession that is admitted into evidence must have been given voluntarily and in compliance with *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (*Miranda* rights include having a lawyer present to advise defendant prior to and during any questioning); *see* TEX.CODE CRIM. PROC. ANN. art. 38.22, § 2 (Vernon 1979); *Ashcraft v. State,* 934 S.W.2d 727, 737 (Tex.App.-Corpus Christi 1996, pet. ref'd). A defendant may waive his *Miranda* rights if the waiver is made voluntarily, knowingly, and intelligently. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (citing *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602). If the totality of circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension, a court could properly conclude that the *Miranda* rights were waived. *Ashcraft,* 934 S.W.2d at 737 (citing *Moran,* 475 U.S. at 421, 106 S.Ct. 1135). Mitten's argument appears to be directed at the issue of whether he was mentally competent to understand his

rights and to waive his right to have counsel present when he made his statement.

At the suppression hearing and at trial,[4] Detective Giddings testified Mitten was calm, not agitated, and appeared to understand questions asked during the preliminary interview. Detective Giddings described the discussion as "just a normal conversation between two people." When Detective Giddings confronted Mitten with discrepancies in his stories regarding what happened at his mother's home, Mitten admitted he killed both his mother and Sifford.

Mitten was warned of his *Miranda* rights before giving his written statement. He signed a *Miranda* rights advisement card. The rights were also contained on every page of his written statement, and Mitten signed each page.[5] He appeared to understand what was being discussed, including his *Miranda* rights. At no time did Mitten indicate any misunderstanding, nor did his demeanor change in a way that suggested to Detective Giddings he did not understand what was happening.

After the statement was prepared, Mitten reviewed it and noted only one discrepancy, his date of birth. That change was made on each page. Detective Giddings testified Mitten's demeanor, the way he was conversing with him and maintaining eye contact with him, lead him to believe Mitten understood what was being said to him. In his opinion, Mitten understood his rights, knew and understood what he was being told, and gave his statement voluntarily.

4. Following a hearing on Mitten's motion to suppress his written statement, the trial judge withheld a ruling on the motion. The court did, however, admit the written statement over defense's objection at trial. Because defense counsel incorporated arguments made during the suppression hearing at trial, we

will consider relevant evidence adduced at the pretrial hearing and at trial.

5. Mitten's written statement and the rights card were admitted as State's Exhibit 1 at the suppression hearing and as State's exhibits 1 and 2, respectively, at trial.

Dr. Robert Lyman, M.D., a psychiatrist who performed a psychiatric competency evaluation on Mitten on December 5, 1997, reported that, on that date, Mitten did not have the ability to consult with an attorney. Dr. Lyman also treated Mitten on August 5, 1997, a few days after he was arrested and gave his written statement. Although Dr. Lyman did not do a competency evaluation in August 1997, Mitten, in his opinion, had improved between August 5 and December 5 of 1997, perhaps because of the medication he was taking. Dr. Lyman also concluded Mitten could probably not have knowingly, intelligently, and voluntarily waived his right to an attorney on August 5, 1997. On cross-examination, however, when asked whether he could determine whether Mitten was incompetent in August based on his evaluation in December, Dr. Lyman responded that "[he could] only make an inference from [his] competency evaluation in December."

Our review of the totality of the circumstances surrounding the interrogation reveals the trial court could have concluded Mitten's statement was uncoerced and that Mitten had the requisite level of comprehension to enable the trial court to properly conclude he had waived his *Miranda* rights. *See Moran,* 475 U.S. at 421, 106 S.Ct. 1135. It is apparent the trial court, in admitting the statement, accepted Detective Giddings's testimony and, while considering the testimony of Dr. Lyman, rejected it. *See Ashcraft,* 900 S.W.2d at 823–24. The trial court did not abuse its discretion in concluding that the statement was taken in compliance with *Miranda* and admitting it into evidence at trial. Mitten's second issue is overruled.

### III. Ineffective Assistance of Counsel

 The standard of review for ineffective assistance of counsel was promul-

gated by *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted in Texas by *Hernandez v. State,* 726 S.W.2d 53, 57 (Tex. Crim.App.1986). First, trial counsel's performance must fall "below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052; *Stone v. State,* 17 S.W.3d 348, 350 (Tex.App.-Corpus Christi 2000, pet. ref'd). Secondly, the appellant must prove that "the deficient performance prejudiced the defense" by "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 686, 694, 104 S.Ct. 2052; *Stone,* 17 S.W.3d at 350. The reviewing court must presume counsel is better positioned than the appellate court to judge the pragmatism of the particular case, and that he made all significant decisions in the exercise of reasonable professional judgment. *Delrio v. State,* 840 S.W.2d 443, 447 (Tex.Crim.App.1992); *Moffatt v. State,* 930 S.W.2d 823, 826 (Tex.App.-Corpus Christi 1996, no pet.). There is a strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance. *Garcia v. State,* 57 S.W.3d 436, 440 (Tex.Crim.App.2001). The record must contain evidence of counsel's reasoning, or lack thereof, to rebut that presumption. *Jackson v. State,* 877 S.W.2d 768, 771 (Tex.Crim.App.1994).

### A. Alleged Failure to Establish Insanity as Basis for Exclusion of Written Statement

 Mitten contends in his third issue he was denied effective assistance because counsel failed to present expert testimony that would have established his serious mental illness and probable insanity at the time of the offense, as a basis for the exclusion of his written statement. However, counsel did provide expert testimony at the suppression hearing to refute

testimony provided by the State regarding the admission of Mitten's written statement. Mitten also argues that counsel should have reurged his objection to the admission of the statement following testimony offered by other expert witnesses. However, based on the qualified opinions expressed by the testifying psychiatrists, it is unlikely the trial court would have sustained such a repeated objection. Therefore, presuming counsel was better positioned than we are now to judge the pragmatism of the particular case, and that he made all significant decisions in the exercise of reasonable professional judgment, *Delrio*, 840 S.W.2d at 447, we conclude trial counsel's performance did not fall "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052. Mitten's third issue is overruled.

### B. Alleged Failure to Challenge Admissibility of Oral Statement

■ By his fourth issue, Mitten argues counsel's assistance was ineffective because he failed to assert a proper legal challenge to the admissibility of Mitten's exculpatory oral assertion that Sifford stabbed his mother, which caused him to stab Sifford. This oral exculpatory assertion contradicted his subsequent written statement wherein Mitten stated he uncontrollably stabbed Sifford and then his mother.

Oral custodial statements are inadmissible unless they lead to the discovery of evidence conducive to establishing guilt. TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3(a), (c) (Vernon Supp.2002). Mitten contends his oral statement did not lead to evidence that was conducive to establishing his guilt, thus, admission of the statement was prohibited by law. However, in his oral statement, Mitten informed the authorities (1) he stabbed Sifford, and (2) the stabbing occurred in Victoria. Without addressing the affirmative defenses raised, these assertions of facts are not controverted and conduce to establish Mitten committed a crime; he stabbed Sifford in Victoria. *See id.*

■ Furthermore, the State contends Mitten's oral statement was admissible because Mitten was not in custody at the time he made the statement. Detective Giddings and Sergeant DeHaven testified Mitten was not in custody while at the army base hospital where he made the complained-of statement. Moreover, Officer Anders testified they did not want Mitten to leave the hospital because he was the only witness and they wanted to get a statement from him as part of the investigation. While Mitten contends otherwise, the State asserts Officer Daniel Anders's testimony also establishes Mitten was not in custody at the time he offered his oral statement.

Again, presuming counsel was better positioned than we are now to judge the pragmatism of the particular case, and that he made all significant decisions in the exercise of reasonable professional judgment, *Delrio*, 840 S.W.2d at 447, we conclude trial counsel's performance did not fall "below an objective standard of reasonableness," when he did not challenge the admissibility of the exculpatory oral assertion. *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052. Mitten's fourth issue is overruled.

### IV. Admission of Statement from Competency Report

By issue five, Mitten contends the trial court erred in permitting, over objection, a statement he made during a pre-trial competency examination to Dr. John Quinn, a forensic psychologist. Mitten contends his statement was statutorily inadmissible and

sufficiently harmful because it related to the issue of his guilt. Article 46.02, section 3(g) of the Texas Code of Criminal Procedure provides:

> No statement made by the defendant during the examination or hearing on his competency to stand trial may be admitted in evidence against the defendant *on the issue of guilt* in any criminal proceeding.

TEX.CODE CRIM. PROC. ANN. art. 46.02, § 3(g) (Vernon 1979) (emphasis added).

 In his May 22, 1998, competency report, Dr. Quinn wrote "[Mitten] is very interested in being found not guilty by reason of insanity and feels that he will be quickly released into the community after a few months." During the course of the trial, this statement was admitted into testimony. However, the jury was aware that Mitten asserted a plea of insanity. Defense counsel commented on the plea of insanity during *voir dire.* Witnesses for the defense offered opinions regarding Mitten's degree of sanity at the time of the murders. In Dr. Quinn's comment, it is clear Mitten is simply expressing a desire that his insanity defense would be successful and that he would be released quickly. We find no implication of the issue of guilt or guilt by reason of insanity in this statement. Furthermore, Mitten provides us with no argument or supporting authority for his general contention that this statement related to the issue of guilt and, thus, sufficiently harmed him. *Cf. Caballero v. State,* 587 S.W.2d 741, 743–44 (Tex.Crim. App.1979) (court found appellant's incrimi-

nating statements made during competency hearing were harmless error because appellant confessed same facts as testified to by appellee's witness). Accordingly, we conclude there was no error. Mitten's fifth point is overruled.

### V. Failure to Transcribe Bench Conferences

 By his sixth issue, Mitten contends the court reporter's failure to transcribe and transmit several bench conferences which occurred during the course of the trial was error.[6] A court reporter is required to make a full record of the proceedings unless excused by agreement of the parties. TEX.R.APP. P. 13.1(a). In *Tanguma v. State,* 47 S.W.3d 663, 667 (Tex.App.-Corpus Christi 2001, pet. ref'd), this Court held, pursuant to appellate rule 13.1, the reporter's duty to record proceedings, including bench conferences that occur after the trial commences, is mandatory, and, thus, noncompliance is error. *Id.; but see Polasek v. State,* 16 S.W.3d 82, 88–89 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd) (holding that section 52.046(a) of Texas Government Code requiring recording be requested is controlling statute, and rule 13.1 is void because it modifies substantive rights of litigant).[7]

The record reveals the complained-of bench conferences were not recorded and Mitten had filed a written pretrial motion requesting all proceedings of the Court be recorded. Further, no agreement to excuse the recording appears in the record. Thus, the court reporter's failure to record

---

**6.** We note that Mitten complains of "several bench conferences" that were not recorded. He provides us, however, with record cites to only three such conferences. Because a brief must contain clear and concise argument for contentions made with appropriate citations to the record, our analysis will be limited to the three conferences specifically identified in his brief. *See* TEX.R.APP. P. 38.1(h).

**7.** In *Tanguma v. State,* 47 S.W.3d 663, 671 (Tex.App.-Corpus Christi 2001, pet. ref'd), we concluded there was no valid reason for holding rule 13.1 void, and respectfully declined to follow *Polasek. Id.*

and transcribe the identified bench conferences that occurred after the trial commenced, without agreement of the parties, constitutes error. *See* TEX.R.APP. P. 13.1(a).

However, a failure to record bench conferences does not automatically result in reversal. *Tanguma,* 47 S.W.3d at 667. Texas Rule of Appellate Procedure 44.2 provides there are two kinds of error in criminal cases, constitutional error and other errors. *Id.* at 674 (citing TEX.R.APP. P. 44.2). Mitten does not claim constitutional error, nor is such implicated in this case. *See, e.g., Arizona v. Fulminante,* 499 U.S. 279, 295–302, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (admission of coerced confession held harmful); *Tanguma,* 47 S.W.3d at 676 (failure of court reporter to record any possible challenges for cause did not rise to level of constitutional error).

We therefore review for errors affecting non-constitutional rights. However, even if non-constitutional error is found, we will disregard any error that does not affect substantial rights. *Id.* at 676 (citing TEX.R.APP. P. 44.2). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (citing *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997)). This Court will not overturn a criminal conviction if a review of the record as a whole assures us that the error did not influence the jury, or had but a slight effect. *Id.* (citing *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998)).

Mitten first complains the court reporter failed to record a bench conference that occurred after defense counsel cross-examined the State's first witness, a staff sergeant who was on duty when Mitten arrived at the Brooke Army Medical Center on the night in question, and after the State advised the court that it had no further questions. Following the unrecorded bench conference, the witness was reminded of the instruction given regarding the trial and that he was subject to recall. The witness was then excused.

The second unrecorded bench conference occurred after the State attempted to offer as an exhibit an original copy of Mitten's voluntary statement. Immediately following the unrecorded bench conference, outside the presence of the jury, defense counsel presented his objections to the admission of the exhibit and the State responded. This subsequent conference was recorded. The court noted the objections and overruled them. When the jury returned, the court admitted the exhibit.

The last unrecorded bench conference occurred when the State asked its expert witness about a statement made by Mitten during a competency evaluation. The court called counsel to the bench and the content of the conference was unrecorded. However, the record reflects that the jury was recessed and the court and counsel held a recorded bench conference on the admissibility of Mitten's statement.

Mitten has asserted no consequences from the failure of the court reporter to record the three bench conferences. Moreover, based on our review of the record as a whole, we cannot ascertain that any substantial right was affected by this failure. Accordingly, while we conclude the court reporter's failure to completely record the proceedings at trial was error, such failure is not of constitutional dimension, nor has it affected Mitten's substantial rights. We must, therefore, disregard the error. TEX.R.APP. P. 44.2(b). Mitten's sixth issue is overruled.

The judgment of the trial court is affirmed.

Majority Opinion by Justice NELDA V. RODRIGUEZ, joined in its entirety by

Chief Justice ROGELIO VALDEZ, Justice FEDERICO HINOJOSA, and Retired Justice DON WITTIG, and joined in parts I, II, III, and V of the majority opinion by Justices J. BONNER DORSEY and ERRLINDA CASTILLO.

Dissenting Opinion by Justice LINDA R. YAÑEZ, joined in part by Justices J. BONNER DORSEY and ERRLINDA CASTILLO.

Dissenting Opinion by Justice LINDA R. YAÑEZ, joined in Part II by Justices J. BONNER DORSEY and ERRLINDA CASTILLO.

The majority holds the evidence is factually sufficient to support the jury's rejection of appellant's affirmative defense of insanity. Because I would hold that: (1) the jury's rejection of the insanity defense is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust; and (2) the trial court erred in admitting the appellant's statement made to Dr. John Quinn during his competency examination, I respectfully dissent.

## Background

On the evening of August 2, 1997, Cody Dewayne Mitten ("Cody")[1] was taken to the emergency room of Citizens Medical Hospital in Victoria, Texas, by his mother, Candelaria Mitten ("Candy"), and her boyfriend, Larry Sifford. Candy was very concerned about Cody because he had been exhibiting odd behavior for a couple of weeks, was suffering from inability to sleep and loss of appetite, and was generally "not acting like himself." Cody had been living with a half-sister in Austin, Texas, and was self-employed doing landscaping work. A couple of days earlier, Candy drove to Austin and brought Cody

back to Victoria because she and others in the family were very concerned about his health. After being examined at the emergency room, Cody was released and returned to his mother's house. Later in the evening, Cody, Candy, and Larry were watching television and eating ice cream. Cody went into the kitchen, picked up a butcher knife, went back into the living room, and stabbed Larry and Candy. Then, he picked up Candy, put her body in the back seat of Larry's Explorer, and drove off. After driving around aimlessly for several hours, he eventually drove up to the emergency entrance at Brooke Army Medical Center in San Antonio. He got out, asked for help, and carried Candy's body inside. At that point, she had been dead for several hours and was pronounced dead at the scene. Several San Antonio police officers were called to the hospital. Eventually, Cody was taken to the San Antonio police station, where he gave a written statement. Larry DeHaven, a San Antonio police officer, contacted a deputy at the Victoria County Sheriff's Department and advised him of the situation. Sheriff's department officers and EMS personnel were dispatched to the Mitten residence, and during their investigation, discovered Larry's body.

A jury found Cody incompetent to stand trial on February 19, 1998. Thereafter, he was committed to Vernon State Hospital for treatment. He was released from the hospital in June 1998 and was adjudged competent to stand trial on July 22, 1998. At trial in late January, 2000, appellant asserted the affirmative defense of insanity, which the jury implicitly rejected through its guilty verdict. The court assessed punishment at life imprisonment.

## I. Affirmative Defense of Insanity

By his first issue, appellant challenges the factual sufficiency of the evidence sup-

---

1. Cody was 21 years old at the time of the offense.

porting the jury's implicit rejection of his insanity defense.

We review the factual sufficiency of evidence supporting an affirmative defense to determine whether, after considering all the evidence relevant to the issue, the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Bigby v. State*, 892 S.W.2d 864, 875 (Tex.Crim.App.1994); *Meraz v. State*, 785 S.W.2d 146, 155 (Tex. Crim.App.1990); *Torres v. State*, 976 S.W.2d 345, 347 (Tex.App.-Corpus Christi 1998, no pet.).

To establish the affirmative defense of insanity, the defendant must prove by a preponderance of the evidence that he did not know that his conduct was wrong at the time of the offense as a result of a severe mental disease or defect. Tex. Pen. Code Ann. § 8.01 (Vernon 1994); *Torres*, 976 S.W.2d at 347. The issue of insanity is not strictly medical; it involves both legal and ethical considerations. *Bigby*, 892 S.W.2d at 877; *Graham v. State*, 566 S.W.2d 941, 948–49 (Tex.Crim.App.1978). "Ultimately, the issue of insanity at the time of the offense excusing criminal responsibility lies in the province of the jury, not only as to the credibility of the witnesses and the weight of the evidence, but also as to the limits of the defense itself." *Bigby*, 892 S.W.2d at 878 (quoting *Graham*, 566 S.W.2d at 952). Although expert witnesses may aid the jury in its determination of whether a mental condition should excuse holding the defendant responsible for his crime, the jury may accept or reject any or all of the opinion testimony of physicians, and can accept lay testimony over that of experts. *Graham*, 566 S.W.2d at 952. The question of insanity should focus on whether a defendant understood the nature and quality of his action and whether it was an act he ought to do. *Bigby*, 892 S.W.2d at 878.

I now turn to an examination of the evidence relevant to the issue of appellant's insanity.

### Expert Testimony

#### A. Defense Witnesses

##### 1) Dr. Gary Aitcheson

Dr. Gary Aitcheson, a licensed psychiatrist at Vernon State Hospital, testified that he conducted an evaluation of appellant to determine whether he was legally insane at the time of the offense. Dr. Aitcheson's evaluation included a review of appellant's medical records, including psychiatric evaluations by other psychiatrists, statements from appellant's family, reports from the hospital in Victoria, records from a video of the crime scene, and an interview by an investigator conducted at the time of appellant's arrest. He testified that he also "scanned" police reports from the San Antonio police officers and the Victoria Sheriff's Office. In addition, he interviewed Cody on January 21, 2000. Dr. Aitcheson diagnosed Cody as suffering from a severe mental illness falling within the general group of illnesses called "psychoses," characterized by hallucinations, delusions, severe thought disorder, and "flat" emotional affect. He testified that although in some circumstances, it is difficult to determine the precise form of psychosis a person is suffering from, he believed the "best" diagnosis is that Cody suffers from paranoid schizophrenia, a severe mental illness. Dr. Aitcheson testified that in his opinion, Cody was legally insane at the time of the offense and did not know that what he was doing was wrong. He further noted that he concurred with the conclusions reached by Drs. Robert Lyman and Anthony Hempel—pursuant to their own psychiatric evaluations of Cody—that Cody was insane at the time of the offense. Dr.

Aitcheson described numerous instances of Cody's behavior occurring over several weeks prior to the incident, including visual hallucinations (imagining that he was turning into an ape), auditory hallucinations (birds and trees talking to him), feeling under the control of outside forces (believing a microchip was implanted in his hand) and feeling "like a zombie." After Cody began receiving anti-depressant medication and treatment at Vernon State Hospital, he "started to realize what he had done and he was horrified by it." Dr. Aitcheson also testified that he was "convinced within a reasonable degree of medical certainty" that Cody was not malingering or "faking" his illness.

On cross-examination, the State elicited testimony from Dr. Aitcheson concerning his review of incident reports maintained on inmates held at the Victoria County Jail. Dr. Aitcheson testified that one of the reports dated in August, 1997 states that "the man he [Cody] allegedly stabbed had come between his mom and him, and he resented him more and more."[2]

*2) Dr. Robert Lyman*

Dr. Robert Lyman, a psychiatrist and the Medical Director of the Gulf Bend MH–MR Center, testified that he first saw Cody on August 5, 1997, a few days after his arrest. Cody was brought in for emergency treatment after he attempted to cut his wrists while in the county jail. Dr. Lyman's initial impression was that Cody was suffering from a psychotic episode. Cody had difficulty communicating, appeared to be in a lot of distress, and made a nonsensical reference to his hand injury, relating it to the biblical story of Cain and Abel. Dr. Lyman testified he saw Cody on six occasions from August 5, 1997 to October 21, 1997. He also treated him in the hospital in November 1997, when Cody attempted suicide a second time by cutting his neck. Dr. Lyman felt from the first visit that Cody was suffering from a psychosis. One of the features of schizophrenia that Dr. Lyman observed in Cody is "affective flattening," which refers to a lack of emotional expressiveness. People suffering from schizophrenia often have a very flat affect.

In December 1997, Dr. Lyman was ordered by the court as a disinterested expert to perform a psychiatric evaluation of Cody. The purpose of the evaluation was two-fold: 1) to determine if Cody was competent to stand trial and 2) to determine if he was legally insane at the time of the offense. Dr. Lyman concluded that Cody was both incompetent to stand trial and legally insane at the time of the offense. Dr. Lyman testified that in his opinion, Cody suffered his "first psychotic break" at the time of the offense and was unable to control his action and unaware that his actions were wrong at the time. He agreed with the findings reached by Dr. Hempel that Cody was suffering from a major mental illness at the time of the offense and did not know the wrongfulness

---

**2.** The jury heard testimony regarding the same incident report from Jeff Janacek, a Victoria County detention officer. On cross-examination by the State, Janacek testified as follows:

Q [Prosecutor]: Are you—Do your records reflect that on August 6 of 1997, the defen-. dant made a comment to an officer, saying that he loved his mom to death and he guessed he was just jealous or got jealous? Do you show that entry for August 6 of '97?

It looks like it would be an officer or deputy sheriff.

A: I don't have an incident report from August 6.

\* \* \* \* \* \*

Q: You wouldn't dispute it if there is a note for August 6, 1997, where the defendant said, "I loved my mother to death and I guess I just got jealous"? You wouldn't dispute that; would you?

A: No, sir.

of his actions. Dr. Lyman felt strongly that Cody was not faking his illness. By the time of trial, Dr. Lyman had treated Cody for about two and a half years, longer than any other psychiatrist involved in his treatment or evaluation.

## B. State Witnesses

### 1) Dr. John Quinn

Dr. John Quinn, a forensic psychologist at Vernon State Hospital, testified as a rebuttal witness for the State. Dr. Quinn saw Cody for about two and a half months between March 3, 1998 and May 22, 1998. He did not conduct an evaluation to determine whether Cody was legally insane at the time of the offense, but did conduct a competency evaluation. As part of the competency evaluation, he diagnosed Cody as suffering from a brief psychotic disorder, which he considered a serious mental disease. He testified that the symptoms of brief psychotic disorder are consistent with those of schizophrenia; the disorders differ primarily in severity and duration. Schizophrenia is characterized by more symptoms which are manifested over a longer period of time. Such symptoms include delusions, hallucinations, disorganized behavior, a diminished ability to function, and exhibition of a flat or emotionless mood. Dr. Quinn concluded, on the basis of several tests, that Cody was not pretending to be mentally ill. Dr. Quinn testified that a person is capable of having rational thoughts during a brief psychotic disorder. He also stated that a person suffering from schizophrenia may nonetheless be capable of functioning fairly normally. A lay person typically describes a person suffering from schizophrenia as someone who "just doesn't appear to be himself."

The State elicited testimony from Dr. Quinn regarding several statements contained in his competency report dated May 22, 1998. In the report, Dr. Quinn described Cody as "evasive and somewhat manipulative." The report also states that, "[h]e [Cody] is very interested in being found not guilty by reason of insanity and feels that he will be quickly released into the community after a few months." On recross, defense counsel elicited testimony clarifying that as part of the required competency classes conducted by the staff at Vernon State Hospital and attended by patients, Cody would have been given specific instructions that an insanity plea was appropriate in his case.

### 2) Dr. Richard Coons

Dr. Richard Coons, a psychiatrist who practices general and forensic psychiatry in Austin, testified for the State. He has testified as a forensic psychiatrist on "many occasions." Dr. Coons conducted a court-ordered insanity evaluation of Cody on September 22, 1998. His evaluation was based on an interview with Cody lasting one to two hours, and a review of his medical records. Dr. Coons concluded that Cody had "something wrong with him," although he was unable to determine whether it was schizophrenia or some other mental disorder. He also said that Cody "had some mental elaboration at the time of the offense." He testified he did not have the impression that Cody was being candid with regard to his memories of the offense. Dr. Coons said that he had asked Cody about the phones being pulled out of the wall at his mother's house. Cody said he "just pulled them out;" asked if he recalled doing so, Cody said, "Vaguely."

Dr. Coons stated that he was unable to give an opinion to a reasonable degree of medical probability as to Cody's sanity at the time of the offense. His report also states that although there is strong evidence Cody was suffering from a severe mental disease, "there is substantial data

which points to him knowing the wrongfulness of his act." Dr. Coons pointed to several factors suggesting that Cody knew his conduct was wrong, including: 1) Cody did not report feeling any fear at the time of the offense, which suggests that paranoia was not a factor in his conduct; 2) the inference that Cody was trying to hide his behavior by pulling the phones out of the wall; and 3) Cody initially gave an oral statement in San Antonio in which he claimed that Larry had stabbed his mother. However, although Dr. Coons identified these factors as militating against a finding of insanity, he did not say they provided a sufficient basis to render an opinion that Cody knew the wrongfulness of his conduct at the time of the offense.

## Non–Expert Testimony

### 1) Dr. David Blanchard

The State offered the testimony of Dr. David Blanchard, a board certified emergency physician who treated Cody on August 2, 1997 at the emergency room of Citizens Medical Hospital in Victoria. Dr. Blanchard testified that Cody did not complain of any specific symptoms, only that his appetite was a bit off and he just didn't "feel right." Dr. Blanchard did not recall whether he talked to Candy; he recalled that Larry did not offer any information regarding specific complaints. Dr. Blanchard testified that Cody made eye contact, answered questions appropriately, did not make any bizarre comments, and did not appear to be suffering from delusions.

Dr. Blanchard also treated Cody several days later, on August 4, 1997, when Cody was brought in for evaluation after suffering a possible seizure in his jail cell. Dr. Blanchard testified from his notes that regarding the seizure, Cody had told him that "he believes he held breath first, then fell—did it deliberately, he said." He also

said that on August 4, Cody had a "flat affect," which had not been observable on August 2, 1997. He explained that a "flat affect" is a condition where a person responds in a flat monotone. Dr. Blanchard stated that on the August 4 visit, Cody was not nearly as communicable or cooperative as he had been on the earlier visit.

### 2) Kyle Kincaid

Kyle Kincaid, an emergency room·nurse at Citizens Methodist Hospital, also testified for the State. She testified that she assisted in treating Cody on the evening of August 2, 1997. Ms. Kincaid testified that Cody complained of weakness, being tired all the time, and not eating or drinking right. He also said that he had been working outside, which prompted a concern that he may have been suffering from heatstroke or a heat-related injury. He did not appear to be in physical distress.

### 3) Larry DeHaven

Larry DeHaven, an officer with the San Antonio police department, testified for the State. DeHaven testified that he was one of the officers called to investigate an incident at Brooke Army Medical Center in the early morning hours of August 3, 1997. DeHaven said he was present in the room at the hospital when Edward Giddings, another San Antonio police officer, was questioning Cody. Cody told the officers that he was watching television with his mother and Larry and heard his mother gasping for air. He turned around and noticed that Larry had stabbed his mother. He then stabbed Larry. DeHaven described Cody as "getting agitated and nervous." Cody was taken to the police station to give a witness statement. DeHaven testified that at the time he was taken to the station, Cody was not a suspect. After the officers learned of the discovery of Larry's body in Victoria, they advised Cody of his *Miranda*[3] rights. De-

---

3. *See Miranda v. Arizona,* 396 U.S. 868, 90 S.Ct. 140, 24 L.Ed.2d 122 (1969).

Haven testified that Cody was able to talk and answer questions and appeared to understand what was happening. DeHaven was not present in the room when Giddings took Cody's statement.

On cross-examination, DeHaven admitted that his report states that at some point, he stopped asking Cody questions because Cody's responses "didn't add up" and "didn't sound right."

### 4) Edward Giddings

Edward Giddings, a San Antonio police officer, testified that he spoke to Cody at the hospital and later obtained his written statement. Giddings testified that when he spoke to Cody at the hospital, Cody gave him two versions of what had occurred. Cody first said that Larry had stabbed his mother and he had pushed Larry out the door. In the second version, Cody said that Larry had stabbed his mother, and that he had then stabbed Larry and pushed him out the door. Giddings testified that at the police station, after learning of the discovery of Larry's body, Giddings asked, "Cody, who did you kill first, your mother or Larry?" After Cody responded, "Larry," Cody was advised of his rights. According to Giddings, Cody acknowledged that he understood his rights and appeared to understand what was going on. He said Cody affirmatively waived his rights and gave a written statement. Giddings said that Cody filled out the form used for witness statements. After reading over his statement, Cody corrected his date of birth on the statement and signed it in the presence of witnesses.

### 5) Karl Wendel

Karl Wendel, formerly a deputy with the Victoria County Sheriff's Department, testified that on August 3, 1997, he received a call from Officer DeHaven in San Antonio advising him that Cody Mitten had arrived at Brooke Army Medical Center with his mother's body. Wendel testified that DeHaven had said they could not get much information out of him because he was "kind of upset." He also testified that DeHaven might have said that Cody was acting "mental" and may have been "playing around."

### 6) Connie Gamez

Connie Gamez, a dispatcher for the Victoria County Sheriff's Department, testified that when DeHaven called advising that Cody was in San Antonio with his deceased mother, he told her, "Subject was either mental or acting mental."

### 7) Gary Smejkal

Gary Smejkal, an officer with the Victoria County Sheriff's Department, testified that after investigating the scene at the Mitten residence on August 3, 1997, he was sent to San Antonio to assist in interviewing Cody. Smejkal testified that Cody asked the officers for identification, which he thought was odd because they were at the San Antonio police station. Later, when Cody was allowed to make several telephone calls, he wrapped the phone in his T-shirt and "gave the impression he didn't want to leave his fingerprints." Smejkal thought the behavior was odd, given that Cody was in the police station.

### 8) Testimony of Family

Various members of Cody's family testified regarding instances of his bizarre behavior in the weeks preceding his arrest. Cody's sister, Tammy Ray, testified that she was so concerned about Cody that she called her mother in Victoria to come to Austin. She told her mother that she planned to investigate the possibility of getting Cody evaluated or committed. Ms. Ray testified that when Cody called her from the San Antonio police station, he said some strange things, including that he was the Holy Spirit, that he felt he was more animal than man, and that she

should read an article in "Reader's Digest" about gorillas in the mist and the DNA makeup of a gorilla.

Cody's aunt, Janell Mitten, testified that Cody had come to their home in Killeen on July 30, 1997. Cody had said that he was not feeling well and that he sometimes felt he was "losing it." Mary Carlow, Cody's aunt and Candy's sister, testified that on the evening of August 2, 1997, Candy asked her to look after Cody while she and Larry went to a wedding reception. Candy was so concerned about Cody that she did not want him to be left alone. Janell later became very concerned because Cody was pale, sweating profusely, and was saying strange things about Cain and Abel, how he had too much hair, and maybe "was supposed to have been born to be an animal." She said Cody was "real jittery" and just "wasn't acting like Cody." She was later surprised to learn that he had been released from the emergency room because it was obvious to her that he wasn't normal. She testified that from what she observed on the afternoon of August 2, 1997, Cody was not able to tell right from wrong.

Other members of Cody's family, including another half-sister, his father, and his uncle, also testified regarding instances of Cody's strange behavior in the weeks preceding the incident.

The evidence shows that three psychiatrists, Drs. Aitcheson, Lyman, and Hempel, determined that Cody suffered from a severe mental illness that rendered him incapable of knowing that his conduct was wrong. Dr. Quinn, the State's rebuttal witness, concluded that Cody's mental illness was real and diagnosed him as suffering from a brief psychotic disorder. Dr. Coons, the State's only rebuttal witness on the issue of Cody's sanity at the time of the offense, was unable to conclusively render an opinion that Cody knew his conduct

was wrong. Dr. Coons pointed to Cody's conduct in pulling the phones out of the wall and initially telling the officers that Larry killed his mother as evidence that he knew right from wrong. However, I do not agree that pulling the phones out of the wall clearly indicates that Cody was attempting to conceal the crime or that he knew the wrongfulness of his conduct. Nothing else about Cody's behavior after the offense suggests an attempt to conceal the evidence of the crime. He left the weapon still embedded in Larry's back at the scene of the crime. He picked up his mother's body, covering himself in blood, and placed it in plain view in the back seat of a vehicle which was easily traceable and linked to his family. He then drove for several hours, arriving at the emergency room of a San Antonio hospital asking for help.

The State argues that Dr. Blanchard, as the emergency room physician who examined Cody on the evening of the incident, was uniquely positioned to observe his behavior with regard to whether he exhibited symptoms of schizophrenia. However, there is no evidence that Dr. Blanchard was provided with any information which would have alerted him to examine Cody for symptoms of schizophrenia. Moreover, Dr. Quinn, the State's rebuttal witness, testified that a person suffering from a brief psychotic disorder may be capable of rational thoughts and someone suffering from schizophrenia is often described as acting "just not like himself." In addition, Dr. Aitcheson testified that often, people with schizophrenia tend to minimize their symptoms and seem to want to "keep it to themselves." I do not find that Dr. Blanchard's testimony is inconsistent with the conclusion of the three medical experts who determined unequivocally that Cody was legally insane at the time of the offense.

I conclude that the jury's verdict is so against the great weight and preponderance of the evidence that it is manifestly unjust. Accordingly, I would sustain appellant's first issue.

## II. Admissibility of Statement Made During Competency Examination

In his fifth issue, Cody contends the trial court erred in admitting, at the guilt/innocence phase of the trial, a statement he made to Dr. John Quinn in the course of his competency examination. Cody contends the admission of the statement violated article 46.02, section 3(g) of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 46.02 § 3(g) (Vernon 1979).

As then chief forensic psychologist at Vernon State Hospital, Dr. Quinn performed a competency examination of Cody. Dr. Quinn testified that he did not conduct a sanity examination of Cody and did not conduct a combined sanity and competency examination.[4] Pursuant to the competency examination, Dr. Quinn prepared a report, which was submitted to the court. At the end of the report, Dr. Quinn included the following statement: "According to Article 46.02, Section 3, no statement made by the defendant during the examination of his competency to stand trial may be admitted in evidence against the defendant on the issue of guilt in any criminal proceedings." On *voir dire* examination, Dr. Quinn testified to his belief that the cited statute prohibits him from testifying on the issue of Cody's insanity.

At trial, following Dr. Quinn's *voir dire* testimony and outside the presence of the jury, Cody's counsel objected to Dr. Quinn's testimony on grounds that it violated article 46.02 section 3(g). *See id.*[5] The State responded, and the following exchange occurred:

> [Prosecutor]: I merely want to ask questions regarding his assessment of [Cody] during the period of time he had contact with the defendant at Vernon State Hospital. *I don't intend to offer any kind of incriminating statements made by the defendant that would in any way cause the doctor to violate his oath or Article 46.02.* It would simply be limited to his assessment of the person, the comments that were generally made to him, his observations of the defendant, and that kind of thing, that I think are very relevant to the issue of insanity.
>
> I don't have any intention of going into asking his opinion on the insanity.
>
> [Cody's counsel]: All I can say in response is that I think they are trying to differentiate Dr. Quinn's testimony from competency and insanity would be very confusing to the jury.
>
> And, in addition, the testimony is being presented as somehow to rebut evidence of insanity. *I think that it's clear that that would be testimony on the issue of guilt.*
>
> * * *
>
> [Court]: Based on the area of proffer that the prosecutor has indicated he is going into, you know, I'm overruling your objection at this time. If the pros-

4. *See De Russe v. State,* 579 S.W.2d 224, 229 (Tex.Crim.App.1979) (article 46.03, pertaining to sanity examination, does not contain prohibition against use of defendant's statements similar to prohibition found in article 46.02, section 3(g)).

5. Counsel also objected on grounds that Dr. Quinn's testimony would violate Cody's rights under the Fifth and Sixth Amendments of the United States Constitution. No such claims were raised on appeal.

ecutor is going into other areas than the areas he had indicated, then—

(emphasis added). Thereafter, the jury was seated, the State proceeded with its direct examination of Dr. Quinn, followed by cross-examination. On re-direct by the State, the following occurred:

[Prosecutor]: And you were asked some questions about the different types of pleas that you discussed at Vernon State Hospital and that was specifically talked about in this particular case, not guilty by reason of insanity?

[Quinn]: That's correct.

Q: Did the defendant make any—Did he talk to you about specifically during your competency examination about that particular issue?

A: Yes.

Q: What do you recall him telling you—

[Court]: Attorneys approach the Bench. (Discussion had at the Bench; not requested, not reported)

[Court]: Members of the jury, I need to recess you just for a couple of minutes.

Outside the presence of the jury, the question was repeated and the following occurred:

[Quinn]: Are you ordering me to answer that question?

[Court]: We're outside the presence of the jury.

[Quinn]: Cody mentioned that he believed that he was not guilty by reason of insanity and that this is how he intended to plead. This was going to be his defense.

[Prosecutor]: Your Honor, may I follow that up with a clarification?

[Court]: Yes.

[Prosecutor]: I believe in your report dated—Well, one was done in May. Let's see—May 22, 1998. The exact comment was—He didn't say he was pleading not guilty by reason of insanity. The statement was that, "He is very interested in being found not guilty by reason of insanity and feels that he will be quickly released to the community after a few months"?

[A]: Yes.

* * *

[Prosecutor]: ... It simply goes to whether or not he—what the doctor's impressions were from his conversations with Mr. Mitten.

And there's been a wealth of testimony from this witness and others regarding manipulation and that aspect. And, certainly, this goes to the issue of whether there is any manipulation on the part of—There has been other testimony brought out as well, but this goes to the issue of manipulation and whether or not the defendant could have been manipulating by feigning or, basically, asking to be found this way so that he could avoid responsibility for his actions.

[Cody's counsel]: Judge, if the State is submitting that this testimony is somehow relevant to show that the defendant was manipulating, to me that would relate directly to an issue of guilt, because trying to show he is manipulating evidence to create a defense has to bear on the issue of guilt.... And I think it directly relates to the issue of the defendant's guilt. It's a statement made to the doctor during the course of the examination. The statement is directly prohibited by—I think it's Section 46.02. And that's what the initial objection was made to. I think it's inadmissible.

* * *

[Court]: Would the State again state the purpose of the offer? For what purpose is the offer being made?

[Prosecutor]: There has been testimony that the defendant was manipulative....

We feel it goes clearly to rebut the defense of insanity, by virtue of the fact that this defendant was faking, this defendant was manipulating various people throughout, and was seeking to, basically, beat the rap. I think it clearly goes to that, Judge, from the testimony. I think it is certainly probative of that particular issue and it should be admitted.

The trial court overruled the objection, the jury was seated, and the prosecutor elicited the following for the jury:

[Prosecutor]: Now, referring to your report dated 5–22–98, in the same paragraph where we talked earlier about your conclusion or opinion, that, "The patient"—the patient being Cody Mitten—"is evasive and somewhat manipulative," is it true that that statement contains a statement, "He is very interested in being found not guilty by reason of insanity and feels that he will be quickly released into the community after a few months"?

[Quinn]: Yes.

### Analysis

Article 46.02, section 3(g) of the code of criminal procedure provides: "No statement made by the defendant during the examination or hearing on his competency to stand trial may be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding." TEX. CODE CRIM. PROC. ANN. art. 46.02 § 3(g) (Vernon 1979).

The majority holds the trial court did not err in admitting the statement made to Dr. Quinn during the competency examination because the statement "simply express[es] a desire that [Cody's] insanity defense would be successful and that he would be released quickly." The majority "find[s] no implication of the issue guilt or guilt by reason of insanity in this state-ment." The record is clear, however, that both Cody's counsel and the prosecutor argued that the statement related to guilt. Cody's counsel argued the statement "relate[s] directly to an issue of guilt, because trying to show he is manipulating evidence to create a defense has to bear on the issue of guilt." Similarly, the prosecutor argued that the statement should be admitted because "it goes clearly to rebut the defense of insanity, by virtue of the fact that this defendant was faking, this defendant was manipulating various people throughout, and was seeking to, basically, beat the rap." Insanity is an affirmative defense. See TEX. PEN. CODE ANN. § 8.01 (Vernon 1994); Martinez v. State, 867 S.W.2d 30, 34 (Tex.Crim.App.1993). Evidence that a defendant is malingering or "faking" symptoms to fabricate an insanity defense is clearly relevant to such a defense. See Moranza v. State, 913 S.W.2d 718, 726 (Tex.App.-Waco 1995, pet. ref'd). I conclude that neither the law nor the record in this case supports the majority's position that the challenged statement does not implicate the "issue of guilt."

In support of its position that a defendant's statements which, although inadmissible on the issue of guilt, may nonetheless be admissible at the guilt phase of the trial, the majority cites only the language of the statute itself. See TEX. CODE CRIM. PROC. ANN. art. 46.02 § 3(g) (Vernon 1979). However, in Perry v. State, 703 S.W.2d 668, 671 (Tex.Crim.App.1986), the court of criminal appeals noted that "[t]he statute expressly prohibits the admission into evidence at the guilt stage of the trial any statement made by the defendant during an examination ordered by the court or a hearing on the defendant's competency to stand trial." See id. (emphasis added). Similarly, in Robinson v. Wade, 686 F.2d 298, 309 n. 23 (5th Cir.1982), the Fifth Circuit, in discussing prosecutorial conduct

at the defendant's capital murder trial, noted that the prosecutor had argued to the trial court that the defendant's statements, made during his competency examination, although inadmissible on *issues* of guilt, were nonetheless admissible in the *guilt phase* of the trial as impeachment. *See id.* The Fifth Circuit noted that at the time of the trial, the prosecutor's argument was "strained," but not "beyond the pale." *Id.* The court then noted, however, that "[d]efinitive rejection of [the prosecutor's argument] came two years later, in *Caballero v. State*, 587 S.W.2d 741 (Tex. Crim.App.1979) (en banc)." *Id.* In *Caballero*, the court of criminal appeals found the trial court clearly erred by admitting at the guilt phase of the trial statements made by the defendant during his competency examination. *Caballero*, 587 S.W.2d at 743. The court found the error harmless, however, because the defendant had confessed to the same facts as were testified to by the State's examining psychologist. *Id.*

In *Perry*, the court of criminal appeals discussed the rationale for the statutory prohibition found in article 46.02, section 3(g):

> However, when it comes to prohibiting the admission in evidence *at the guilt stage of the trial* statements that a defendant made during the examination or hearing on his competency to stand trial, we find that there is a far greater reason why such is prohibited as a matter of law.
>
> In making the determination whether an accused person is legally incompetent to stand trial, *i.e.*, whether he has (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against him, it is extremely important that the defendant should be free to make any statement to the examiner that will enable that person to reach the proper conclusion. This, of course, will encompass statements by the defendant that might relate to the details of the criminal offense for which he is charged with committing; statements about his past life; statements that pertain to any disorders the defendant might be suspected of having; statements about his schooling; statements about his past employment; statements about any military service, *etc.*, any of which might be extremely damaging or incriminating on the issue of the defendant's guilt.
>
> In mandating that "no statement made by the defendant during the examination or hearing on his competency to stand trial may be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding," we believe that it was the intention of the Legislature that without any limitations or restrictions there would be free discussion on the part of the defendant when he is examined to determine his competency to stand trial and that such would occur without any fear on the part of the defendant that any statement that he might make would be used against him *at the guilt stage of the trial.* A clear reading of the statute makes it obviously clear that it actually amounts to a Legislative grant of use or testimonial immunity to any statement that the defendant might make to the examiner or to any statement that he might make during the hearing.

*Perry*, 703 S.W.2d at 672 (emphasis added). I agree with the court's interpretation and reasoning as articulated in *Perry*. Accordingly, I would hold that the trial court erred in admitting Cody's statement made to Dr. Quinn during his competency examination because the statement was barred by article 46.02, section 3(g). TEX.

CODE CRIM. PROC. ANN. art. 46.02 § 3(g) (Vernon 1979).

I would also hold that the trial court's error in admitting Cody's statement was not harmless. *See* TEX. R. APP. P. 44.2. Unlike the circumstances in *Caballero*, where error in admitting the appellant's statement was rendered harmless by admission of the appellant's written confession containing the same facts, in the present case, no other evidence was offered to show an admission by Cody that he was malingering or "faking" an insanity defense in order to "beat the rap." I would hold, therefore, that the error was harmful, and would sustain Cody's fifth issue.

Accordingly, I would reverse the judgment of the trial court and remand for a new trial.

Justices J. BONNER DORSEY and ERRLINDA CASTILLO join in Part II.